```
 1                IN THE UNITED STATES DISTRICT COURT

 2               FOR THE EASTERN DISTRICT OF TEXAS

 3                        MARSHALL DIVISION

 4   HUAWEI TECHNOLOGIES CO.      )(

 5   LTD.                         )(    CIVIL ACTION NO.

 6                                )(    2:20-CV-030-JRG

 7   VS.                          )(    MARSHALL, TEXAS

 8                                )(

 9   VERIZON COMMUNICATIONS,      )(    DECEMBER 17, 2020

10   INC., ET AL.                 )(    1:12 P.M.

11               CLAIM CONSTRUCTION HEARING

12                  BY VIDEO CONFERENCE

13        BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

14             UNITED STATES CHIEF DISTRICT JUDGE

15

16   FOR THE PLAINTIFF:      Mr. Justin T. Nemunaitis
                             Mr. Hamad M. Hamad
17                           Mr. Alexander Anthony Waldrop
                             Mr. Robert Seth Reich, Jr.
18                           CALDWELL CASSADY & CURRY, PC
                             2121 North Pearl Street
19                           Suite 1200
                             Dallas, Texas 75201
20
     COURT REPORTER:         Shelly Holmes, CSR, TCRR
21                           Official Reporter
                             United States District Court
22                           Eastern District of Texas
                             Marshall Division
23                           100 E. Houston Street
                             Marshall, Texas  75670
24                           (903) 923-7464

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

```
 1                              Mr. Greg Love
                               LOVE LAW FIRM PC
 2                              P.O. Box 948
                               107 East Main Street
 3                              Henderson, Texas 75652

 4   FOR THE DEFENDANTS:       Mr. Charles K. Verhoeven
                               Mr. Brian E. Mack
 5                              QUINN EMANUEL URQUHART
                               & SULLIVAN LLP
 6                              50 California Street
                               22nd Floor
 7                              San Francisco, California 94111

 8                              Mr. Patrick Curran
                               QUINN EMANUEL URQUHART
 9                              & SULLIVAN, LLP
                               51 Madison Avenue
10                              22nd Floor
                               New York, New York 10010
11
                               Ms. Deepa Acharya
12                              Mr. Patrick J. Stafford
                               QUINN EMANUEL URQUHART
13                              & SULLIVAN LLP
                               1300 I Street Northwest
14                              Suite 900
                               Washington, D.C. 20005
15
                               Mr. Brett N. Watkins
16                              QUINN EMANUEL URQUHART
                               & SULLIVAN
17                              711 Louisiana
                               Suite 500
18                              Houston, Texas 77002

19                              Mr. Deron R. Dacus
                               THE DACUS FIRM, PC
20                              821 ESE Loop 323
                               Suite 430
21                              Tyler, Texas 75701

22

23

24

25
```

1
                   I N D E X

2

3   December 17, 2020

4                                                           Page

5        Appearances                                        1

6        Hearing                                            4

7        Court Reporter's Certificate              131

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

01:12:43   1              [REPORTER'S NOTE:  During the following

01:12:43   2   proceedings, there were disruptions in the audio as a

01:12:43   3   result of it being held by videoconferencing.  These are

01:12:43   4   noted in the transcript.]

01:12:43   5                              ***

01:12:43   6              THE COURT:  Good afternoon, counsel.  This is

01:12:45   7   Judge Gilstrap.  We'll proceed with claim construction in

01:12:53   8   the Huawei versus Verizon, et al., matter.  This is Civil

01:12:55   9   Case No. 2:20-CV-030.

01:12:58  10              Let me ask for announcements on the record.  Let's

01:13:06  11   begin with the Plaintiff.

01:13:06  12              What says the Plaintiff, Huawei?

01:13:09  13              MR. LOVE:  Good afternoon, Your Honor.  Greg Love

01:13:11  14   for Huawei, and Plaintiff is ready to proceed.

01:13:13  15              Along with myself, I have Justin Nemunaitis, who

01:13:17  16   is pictured on camera here.  He will be arguing a portion

01:13:21  17   of the claim construction, along with Hamad Hamad, Alex

01:13:27  18   Waldrop, and Seth Reich.

01:13:31  19              THE COURT:  All right.  And Plaintiff's ready to

01:13:33  20   proceed, Mr. Love?

01:13:35  21              MR. LOVE:  Yes, Your Honor.

01:13:36  22              THE COURT:  What's the announcement from

01:13:37  23   Defendants?

01:13:39  24              MR. DACUS:  Good afternoon, Your Honor.  Deron

01:13:41  25   Dacus on behalf of the Defendants.  And here with me as

01:13:45  1   co-counsel are Charlie Verhoeven, Patrick Curran, Brian

01:13:49  2   Mack, Deepa Acharya, Brett Watkins, and Patrick Stafford.

01:13:56  3   And from Verizon, Your Honor, we have Mike Holden, Jack

01:14:02  4   Minnear, and Sanjeev Mehta, Your Honor.  And we're ready to

01:14:08  5   proceed.

01:14:08  6           THE COURT:  All right.  Thank you, Mr. Dacus.

01:14:09  7           Counsel, let me remind you again, and those

01:14:13  8   listening in, as well, unless you're actually speaking with

01:14:16  9   the Court, please make sure all your devices, computers,

01:14:22  10  telephones, any other device remain muted, again, unless

01:14:27  11  you're speaking to the Court.

01:14:28  12          Also, I'll remind you, to facilitate the Court

01:14:31  13  interjecting questions, if you will keep at least one eye

01:14:36  14  on me while you make your presentations.  If you see me

01:14:39  15  raise my hand, that means please stop, I have a question to

01:14:43  16  ask.  That keeps me from talking over you and avoids any

01:14:47  17  resulting confusion in the record.

01:14:49  18          Also, I'll note that previously, on yesterday --

01:14:57  19  some time yesterday, the parties filed Document 135 on the

01:15:02  20  docket here indicating a suggested order for argument with

01:15:06  21  regard to the disputed claim terms set for construction as

01:15:11  22  a part of this Markman hearing.

01:15:12  23          I will note that subsequent to that, the Court's

01:15:16  24  received an updated and amended list and order of terms to

01:15:22  25  be argued.  I don't find that's actually been filed yet,

01:15:26   1   but that's the proposed order that the Court intends to

01:15:32   2   follow, with one exception, and that is I intend -- if we

01:15:39   3   have not already reached it in the ordinary order of

01:15:42   4   things, I intend to transition 30 minutes from the end of

01:15:49   5   our allocated time today to cover the Verizon patents under

01:15:55   6   that portion of the list.

01:15:58   7          I am concerned as the way -- the way things are

01:16:01   8   presently structured that without allocating some specific

01:16:03   9   time to cover those, we may not get through the Huawei

01:16:09   10  patents and get to the Verizon patents by the end of our

01:16:11   11  time today, and I want to make sure we get some time

01:16:14   12  dedicated to the arguments concerning the disputed claim

01:16:18   13  language within the Verizon patents.

01:16:20   14         So 30 minutes from the end, I intend to transition

01:16:23   15  to the Verizon patents, irrespective of where we are on the

01:16:28   16  parties' suggested priority list, just so that you will

01:16:36   17  know.

01:16:36   18         With that, I'm prepared to begin the claim

01:16:40   19  construction process, and we'll start with data blocks,

01:16:52   20  data blocks containing data only, and data block group

01:16:56   21  containing data blocks only from the '433 patent.

01:17:02   22         Let me hear proposed argument from Verizon first,

01:17:06   23  and then I'll hear argument from Huawei second on this

01:17:12   24  term.

01:17:12   25         MS. ACHARYA:  Good morning, Your Honor.  Deepa

01:17:15  1  Acharya for Verizon.

01:17:16  2       I'm going to be speaking on behalf of Verizon for

01:17:19  3  the '433 patent terms and the '151 patent terms that we're

01:17:24  4  going to be discussing today.

01:17:25  5       THE COURT:  All right.  Counsel, please proceed.

01:17:30  6       MS. ACHARYA:  Your Honor, if you -- I believe you

01:17:32  7  have our slide deck that we submitted yesterday.

01:17:34  8       THE COURT:  I do.

01:17:35  9       MS. ACHARYA:  And if you turn to Slide 5 in the

01:17:39  10 '433 deck that we submitted.

01:17:42  11      This slide shows what the dispute is with respect

01:17:45  12 to this term.  The dispute is whether these data blocks in

01:17:50  13 the data block group should be limited to just containing

01:17:54  14 data or if they should contain other types of information,

01:17:58  15 as Huawei contends.

01:18:00  16      If you look at Slide 6, you can see that Huawei --

01:18:06  17 there's clearly a dispute because Huawei is trying to

01:18:08  18 interject other types of information that's not

01:18:10  19 contemplated for by the specification or the intrinsic

01:18:14  20 evidence.

01:18:14  21      For example, Huawei is trying to include network

01:18:17  22 monitoring information, these other types of information

01:18:21  23 that's not data.

01:18:23  24      As you can see in their brief, they're saying that

01:18:26  25 there's information, and that's in addition to customer

01:18:28   1   service data.

01:18:30   2            THE COURT:  Let me ask you this, counsel.  Is

01:18:32   3   there data that is not control information and is also not

01:18:36   4   service data, in your view?

01:18:40   5            MS. ACHARYA:  There is data that can be

01:18:43   6   transmitted in a control block, but service data can only

01:18:48   7   be transmitted in data block.

01:18:52   8            So there's other types of information that could

01:18:56   9   be transmitted in a control block, but the information that

01:18:59   10  can be transmitted in a data block can only be the type of

01:19:02   11  data that's specified in the specification, which is

01:19:05   12  service data.

01:19:06   13           And the specification is pretty clear -- I mean,

01:19:11   14  there's this control information, and then there's this

01:19:15   15  data information that goes into these data blocks.

01:19:16   16           THE COURT:  Tell me --

01:19:17   17           MS. ACHARYA:  And starting --

01:19:17   18           THE COURT:  Tell me what you --

01:19:20   19           MS. ACHARYA:  Sorry.  Go on, Your Honor.

01:19:21   20           THE COURT:  Tell me what you understand service

01:19:22   21  data to comprise.

01:19:24   22           MS. ACHARYA:  Sure.  So if you look at Slide 15,

01:19:33   23  the specification has a definition of what service data is.

01:19:36   24  It's a type of client information that's going to be

01:19:40   25  transmitted.  We're talking about voice, we're talking

01:19:42  1  about data, multi-media data, other types of services that

01:19:46  2  are the actual information that the client wants to

01:19:48  3  transmit.

01:19:48  4       And that's different from the types of control

01:19:52  5  information or other information that needs to be

01:19:54  6  transmitted for the network to be able to, for example,

01:19:58  7  understand what's being transmitted or on the receive side,

01:20:01  8  be able to decipher, decode what (audio drops).

01:20:10  9       THE COURT:  We lost you, counsel.  Are you there?

01:20:29  10       I'm assuming somebody pulled the plug on

01:20:36  11  Ms. Acharya and that she'll call back in.  So we'll wait

01:20:40  12  and see.

01:20:51  13       MS. ACHARYA:  Can everybody hear me?

01:20:53  14       THE COURT:  I can hear you, Ms. Acharya.

01:20:55  15       MS. ACHARYA:  I apologize for that.  I had an

01:20:57  16  error on my end.

01:20:59  17       THE COURT:  Go ahead.

01:20:59  18       MS. ACHARYA:  So I was saying that the service

01:21:02  19  data specified by the patent -- it's the voice, data, the

01:21:07  20  types of client information that you would send

01:21:10  21  multi-media.  And that's different from the information

01:21:13  22  such as control information that's needed for the network

01:21:16  23  to be able to understand what's being trans -- transmitted.

01:21:18  24       So that service data is what the patent references

01:21:20  25  when we're talking about what we're talking about, the data

01:21:22  1   that goes into these data blocks.

01:21:24  2         So the reason that Verizon wanted to include

01:21:31  3   service data in the construction is really to just make

01:21:33  4   sure that we're not trying to include other types of

01:21:36  5   information that's not contemplated for by the

01:21:38  6   specification when we're talking about the data that goes

01:21:40  7   into these data blocks.

01:21:41  8         And if Your Honor takes a look at Slide 11 --

01:21:46  9   basically, Slides 11 to 13 talk about the excerpts from the

01:21:51 10   specification that show time and time again -- almost

01:21:55 11   exclusively the specification refers to data blocks

01:21:58 12   containing data only or data block groups containing data

01:22:03 13   only.

01:22:04 14         And, actually, if you do a control find in the PDF

01:22:07 15   of the '433 patent, you will almost never see data block

01:22:12 16   without that additional text saying "containing data only."

01:22:17 17   The specification or the claims are very clear that when

01:22:20 18   we're talking about data blocks, we're talking about data

01:22:24 19   blocks that contain data only.

01:22:25 20         THE COURT:  In your view, counsel, is there a

01:22:27 21   difference between control information and control

01:22:29 22   characters?

01:22:31 23         MS. ACHARYA:  There is.  Control characters are --

01:22:37 24   it's -- it's another kind of indicator that's being sent

01:22:40 25   with the control information.  And I think it -- it tells

01:22:43   1   you the type of control information that's being sent.

01:22:47   2            These are different from the identifiers that are

01:22:49   3   in the claims, though.  There's four different identifiers

01:22:51   4   in the claims, and then there's also control characters.

01:22:54   5   And that would be different from control information that's

01:22:57   6   being sent within the control blocks.

01:23:01   7            THE COURT:  All right.  What else do you have for

01:23:03   8   me on this term?

01:23:03   9            MS. ACHARYA:  Sure.  So if you turn to -- if you

01:23:10   10  turn to Slide 17, you see -- the issue that we see with

01:23:14   11  Huawei's interpretation of this term is that they're

01:23:19   12  essentially reading out the word "only data" from the

01:23:23   13  construction and from the claim.

01:23:25   14           The claims are explicit.  It says:  Data blocks

01:23:27   15  containing data only.  Well, if you're allowed to include

01:23:30   16  other types of information, such as network monitoring

01:23:33   17  information, you're no longer sending the service data that

01:23:36   18  the -- that the patent contemplates for.  So you're

01:23:39   19  essentially reading that term out, and legally, that's

01:23:41   20  inappropriate.

01:23:42   21           And if you turn to Slide 19, you'll see in the

01:23:47   22  briefing that Huawei talks about how we're trying to get a

01:23:49   23  disclaimer.  And I think that's a red herring really here

01:23:52   24  because we're not saying that it's a disclaimer.  I mean,

01:23:56   25  we're just reading the terms in the claim which have that

01:24:00   1   word "only" in there.  We're not trying to add the word

01:24:03   2   "only."  That's what's in the claims.

01:24:04   3           And we're only asking the Court to really give

01:24:08   4   credits to the terms that are actually in this claim.

01:24:16   5           And that's it from our side for this argument.

01:24:19   6           THE COURT:  All right.  Let me hear a response

01:24:20   7   from Huawei.

01:24:21   8           MR. NEMUNAITIS:  Thank you, Your Honor.  Justin

01:24:23   9   Nemunaitis for Huawei.

01:24:24   10          Your Honor asked a question:  Is there a

01:24:28   11  difference between service data and some other type of

01:24:31   12  data?  And I think that really gets to the issue here.

01:24:34   13          The patent draws a distinction between control

01:24:40   14  blocks and data blocks.  And this is shown in Figure 1 of

01:24:43   15  the patent.  A control block is something that has a

01:24:47   16  control character, and it may only contain control

01:24:51   17  characters or it may also contain some data if there's

01:24:54   18  extra space to -- to transport more data.

01:24:56   19          A data block is something that only contains data,

01:25:00   20  so the patent draws a distinction between data blocks that

01:25:03   21  only contain data, which go at the end of the encoding

01:25:08   22  block, and control blocks that are supposed to go upfront.

01:25:12   23          The problem with Verizon's proposal is that

01:25:15   24  they're not proposing a definition of any word in the

01:25:18   25  claim.  They just want to insert a new word into the claim,

01:25:22   1   and it creates this -- this ambiguity because Verizon is a

01:25:25   2   service provider.

01:25:26   3           So Verizon can provide cable television or

01:25:30   4   streaming audio to one of its customers, and it sounds like

01:25:34   5   both sides agree that if Verizon is using this patent to

01:25:39   6   provide cable television or streaming audio to a customer,

01:25:42   7   that that -- that would be a way to practice the patent.

01:25:47   8           Where we get into a dispute is if Verizon is, for

01:25:50   9   example, using this technology to transport data from one

01:25:52   10  of its customers's data centers to a different data center.

01:25:57   11  Are they really providing a Verizon service at that point?

01:26:00   12          You know, our position would be all the patent

01:26:03   13  cares about is if you are using the encoding scheme as

01:26:06   14  described in the claims, and so that would still meet the

01:26:08   15  claims.

01:26:09   16          But the argument we may run into from Verizon is

01:26:12   17  we're not providing a service like streaming audio or video

01:26:16   18  or something like that, and so, therefore, we don't meet

01:26:18   19  the claims.

01:26:19   20          But the claims themselves, none of them say that

01:26:21   21  this patent is limited to only providing television or

01:26:24   22  music or something like that.  It's a way of encoding data

01:26:27   23  to transport over an OTN.  It's -- it's not limited to that

01:26:31   24  sort of higher level sort of issue.

01:26:34   25          The other point I would raise as to the disclaimer

01:26:39  1   issue, Verizon referred to Slide 15 as providing a

01:26:42  2   definition of service data.  But on their Slide 15, all

01:26:49  3   the -- all that part of the specification says is when

01:26:53  4   transmitting service data, a communication system encodes

01:26:56  5   the service data to be transmitted through an encoding

01:26:59  6   scheme of adapted for a payload bandwidth.

01:27:03  7        That doesn't say this patent is only used when

01:27:05  8   transporting services like music or video.  It just says

01:27:08  9   when you're using it in that way, you will use an encoding

01:27:12  10  scheme.

01:27:12  11        The other example discusses:  With increasing

01:27:16  12  bandwidth requirements caused by the increase in people's

01:27:20  13  demand for voice, data, multi-media, and other services,

01:27:23  14  the OTN has gradually become a core platform for bearer

01:27:28  15  services of various operators.

01:27:30  16        Again, all this is saying is that an OTN is one

01:27:32  17  type of technology that can be used to provide these

01:27:34  18  services.  It is not saying OTN is only used to provide

01:27:40  19  these types of services because OTN can be used for all

01:27:44  20  kinds of things.  It can be used by Verizon to deliver

01:27:47  21  services, or it can be used by a company to link up its

01:27:50  22  data centers, or it can be used by Verizon to communicate

01:27:54  23  between different parts of its equipment so that it can,

01:27:57  24  you know, turn on additional services that it provides to

01:28:00  25  customers.

01:28:01  1          And so for those reasons, we believe that Verizon

01:28:03  2  has not shown that there's a reason to change the claim

01:28:06  3  language as written.

01:28:07  4          THE COURT:  All right.  Do you have any brief

01:28:11  5  follow-up, Ms. Acharya?

01:28:15  6          MS. ACHARYA:  Just briefly, Your Honor.

01:28:16  7          Referring to Slide 15, I don't think we're

01:28:19  8  necessarily trying to limit the claims any more so than

01:28:23  9  what's set forth in the specification.  We just want to

01:28:25  10  make sure that Huawei is not going to be interjecting

01:28:28  11  additional control types of information such as like they

01:28:31  12  said the network monitoring type of information.  Those

01:28:34  13  types of information are not contemplated for by the patent

01:28:37  14  in terms of transmitting within the data blocks.

01:28:42  15          THE COURT:  All right.  Thank you, counsel.

01:28:43  16          Let's move on to the next disputed term.  This

01:28:46  17  also is from the '433 patent.  We'll take up next control

01:28:53  18  block buffer and data block buffer.

01:28:59  19          We'll follow the same approach.  Let me hear from

01:29:02  20  Verizon first.

01:29:03  21          MS. ACHARYA:  Your Honor, I'll be handling this

01:29:07  22  term as well.

01:29:09  23          The dispute here which is shown on Slide 21 of

01:29:10  24  that same slide deck is whether the data block buffer and

01:29:15  25  the control block buffer are separate buffers or whether

01:29:18  1   you can have a single buffer solution as Huawei contends.

01:29:21  2           If you look on Slide 23, we show that over and

01:29:28  3   over again, the specification is very explicit, again, in

01:29:33  4   the sense that you have a buffer that handles pure data as

01:29:37  5   set forth in the figure for 7A, and this pure buffer data

01:29:44  6   holds the data blocks that contain the data only.

01:29:48  7           So the argument is similar to what we were talking

01:29:50  8   about before in the sense that there's this clear

01:29:54  9   delineation between data and control information.  And we

01:29:57  10  have a buffer here that's designated for just containing

01:30:00  11  data blocks.

01:30:00  12          And the specification is clear that when we're

01:30:03  13  putting data blocks into a buffer, we're not just putting

01:30:06  14  it into any buffer, we're putting it into a buffer

01:30:09  15  containing data blocks only.

01:30:13  16          If you turn to Slide 24, you can see that there's

01:30:16  17  a second buffer, 7B -- Figure 7B in the patent.  And this

01:30:22  18  is where the specification says you place control blocks

01:30:24  19  into this control block buffer.  And as you can see from

01:30:31  20  Figure 7A on the previous side and 7B on this side, there's

01:30:31  21  a clear delineation around these buffers.  There's a

01:30:35  22  specific line around these buffers to show that they're

01:30:38  23  separate.

01:30:39  24          And if you look on the left-hand side of this

01:30:41  25  figure, they also have row numbers.  You can see from 1 to

01:30:44  1   16.   Each of them have separate row numbers going from 1 to

01:30:48  2   16.

01:30:48  3          We don't see a situation where the data block

01:30:53  4   buffer starts from 1 to 16 and then the control block

01:30:56  5   buffer starts on 17 to show that they're continuous --

01:31:02  6   tiguous.  Instead, it shows that they're separate buffers.

01:31:04  7          And, again, if you look at the claims on Slide 25,

01:31:07  8   the claims show that you're putting the control blocks into

01:31:13  9   a control block buffer, or you're putting the data blocks

01:31:16  10  into a data block buffer.  The two are separate.

01:31:21  11         Turning to Slide 26, you can see what the issue is

01:31:24  12  with respect to Huawei's construction.  The claims are

01:31:27  13  specific.  They say that this -- this buffer, this data

01:31:33  14  block buffer contains data blocks only.  It only contains

01:31:36  15  the data blocks, and that's what the specification teaches

01:31:38  16  you, as well.

01:31:39  17         Well, if you're allowed to include control

01:31:43  18  information or this one buffer solution as Huawei proposes,

01:31:46  19  you no longer have a buffer that contains just data, you're

01:31:49  20  going to have a buffer that contains control information,

01:31:53  21  and that violates the claim.

01:31:54  22         The claim says that you have this data buffer that

01:31:57  23  contains data, and you have this control buffer that

01:31:59  24  contains control.  And it, again, uses the word "only" in

01:32:03  25  the sense that you have this buffer that can only contain

01:32:06  1   data blocks.

01:32:07  2        So under Huawei's proposed interpretation of this

01:32:10  3   claim, you would then have this buffer that contains

01:32:13  4   control information which would violate the plain language

01:32:16  5   of this claim, in fact.

01:32:17  6        And if you look at the prosecution history, we

01:32:21  7   believe that this supports our construction, as well.  On

01:32:26  8   Slide 27, you can see here that the applicants added the

01:32:30  9   term "data block" in front of "buffer" at the very end of

01:32:33  10  that excerpt that we have there.

01:32:34  11       And the reason for that is to show that we're not

01:32:38  12  talking about just any buffer, we're not talking about the

01:32:41  13  buffer that was referenced right before that section, which

01:32:44  14  is the control block buffer, we're talking about a separate

01:32:49  15  buffer, which is the data block buffer.

01:32:51  16       And Huawei raises the point that the examiner --

01:32:53  17  or the applicant eliminated the word "containing data only

01:32:58  18  blocks" at the end of that claim.  Well, the reason for

01:33:01  19  that is that same language is included above when it says

01:33:04  20  data blocks containing data only.

01:33:06  21       Since this buffer only contains data blocks, it

01:33:09  22  would be redundant to repeat "containing data only."  But

01:33:16  23  the fact that the applicant added the word "data block"

01:33:16  24  makes it clear that they were talking about something

01:33:21  25  different than what was the control buffer from before.

01:33:22   1              THE COURT:  Let me ask you this.  In your proposed

01:33:25   2    construction of data block buffer, you propose:  Dedicated

01:33:32   3    buffer for only pure data.

01:33:33   4              You want to tell me what pure data means?

01:33:36   5              MS. ACHARYA:  Pure data comes from the

01:33:39   6    specification.  If you look on Slide 23, that -- that's

01:33:43   7    what the specification uses to reference the fact that

01:33:45   8    we're not talking about control information.  This is just

01:33:48   9    another example of how the specification is trying to make

01:33:51  10    it extremely clear that we're talking about a buffer that

01:33:55  11    only contains data, which is why I believe the

01:33:58  12    specification uses the word "pure," and that's why we

01:34:03  13    included it in our -- in our (audio drops).

01:34:06  14              THE COURT:  All right.

01:34:07  15              MS. ACHARYA:  And that's it, Your Honor -- that's

01:34:09  16    it from my end.

01:34:10  17              THE COURT:  Let me hear from Huawei then.

01:34:12  18              MR. NEMUNAITIS:  Thank you, Your Honor.  Justin

01:34:14  19    Nemunaitis for Huawei.

01:34:16  20              THE COURT:  Go ahead.

01:34:17  21              MR. NEMUNAITIS:  As to the last question -- can

01:34:21  22    Your Honor hear me?

01:34:22  23              THE COURT:  I can.  I said:  Go ahead.

01:34:25  24              MR. NEMUNAITIS:  I'm sorry.  I lost the video

01:34:27  25    on -- on this, but I'll keep talking.

01:34:29   1          As to the last question about pure data, that

01:34:34   2   phrase is in Figure 7 of the patent where it refers to the

01:34:39   3   pure data block buffer.  If you look at that figure, what

01:34:43   4   it is referring to is the coding blocks that have only data

01:34:50   5   blocks which is in contrast to the coding blocks that have

01:34:54   6   a mix of control blocks and data blocks.

01:34:56   7          So what it's really saying there it's a buffer

01:34:59   8   containing data blocks that -- that just have the data.

01:35:01   9          As to the -- the broader issue of (audio drops)

01:35:08   10   versus data block buffer, the claims do not say that the

01:35:12   11   control block buffer contains control blocks only.  They

01:35:15   12   don't say that the data block buffer contains data blocks

01:35:19   13   only.

01:35:20   14          What Verizon is trying to do is insert a new

01:35:23   15   limitation that says you have to have a control block

01:35:27   16   buffer that includes control blocks, and you have to have a

01:35:32   17   data block buffer that includes data blocks, and you have

01:35:35   18   to show that neither one of those buffers contains anything

01:35:39   19   else.

01:35:39   20          But that extra step, that extra negative

01:35:42   21   limitation that they want to stick in, that is not present

01:35:45   22   in the claim language.  And that was the language that was

01:35:47   23   removed during prosecution.  So there's no reason to insert

01:35:52   24   here as a matter of claim construction.

01:35:53   25          I think the closest case on point for this issue

01:35:57  1   is the Linear Tech. v. ITC case.  That's 566 F.3d 1049.

01:36:05  2   And I wanted to point that out to the Court because the

01:36:08  3   issue there was that the patent -- that was a voltage

01:36:13  4   regulator.  So this would be some device that controls the

01:36:15  5   electricity going into something else like a laptop.  And

01:36:18  6   it had two modes.

01:36:21  7        In Mode 1, there was a first circuit that

01:36:24  8   controlled the voltage.  In Mode 2, which was the sleep

01:36:27  9   mode, there was a second circuit that controlled the

01:36:30  10  voltage going to the device.

01:36:31  11       The ALJ in that case found that because the claim

01:36:35  12  recited this first circuit with the first function and the

01:36:40  13  second circuit with the second function, the claim required

01:36:42  14  two separate and distinct circuits.

01:36:45  15       The Federal Circuit said:  No, we don't impose a

01:36:47  16  negative limitation just because the claim recites

01:36:50  17  different limitations for different functions.  And so it

01:36:53  18  found that there could be overlapping circuitry that could

01:36:57  19  be identified to show infringement of that claim.

01:36:59  20       And I think we have a similar issue here where

01:37:02  21  because there's no negative limitation in the claim,

01:37:05  22  because there's no clear and unambiguous disclaimer in the

01:37:09  23  specification, there's no reason to insert that -- that

01:37:13  24  limitation into the claim.

01:37:14  25       And one last point.  Ms. Acharya did go through

01:37:18  1  some examples in the specification talking about separate

01:37:21  2  buffers.  But, again, those are just examples.  There is no

01:37:24  3  statement that Verizon has identified saying that the

01:37:28  4  claims must be limited to these particular examples.

01:37:30  5       THE COURT:  Let me ask you this.  Is there a

01:37:37  6  description somewhere of one buffer that stores both data

01:37:41  7  and control blocks?

01:37:43  8       MR. NEMUNAITIS:  The way those terms are used

01:37:47  9  generally in the patent, it is left ambiguous or agnostic

01:37:51  10  to the type of implementation.  I -- I don't believe

01:37:54  11  there's a specific example that specifically recommends

01:37:59  12  doing that.

01:38:00  13       But, again, the fact that -- that a patent focuses

01:38:03  14  on, you know, one particular example is not a reason to

01:38:06  15  limit the claims to just that example.

01:38:07  16       THE COURT:  All right.  Anything else,

01:38:12  17  Mr. Nemunaitis?

01:38:13  18       MR. NEMUNAITIS:  No, Your Honor.

01:38:15  19       THE COURT:  Any follow-up, Ms. Acharya -- Acharya?

01:38:24  20       MS. ACHARYA:  Very briefly.

01:38:25  21       I just wanted to point out that the cases that

01:38:27  22  counsel identified in the briefing and today, they're

01:38:29  23  different in the sense that they don't have the word "only"

01:38:32  24  in the claims and the specification.  The difference here

01:38:34  25  is that the specification and claims specifically delineate

01:38:37   1   two separate structures.  And in these other cases, the
01:38:41   2   specifications and the claim leave open the ability for
01:38:45   3   these two separate structures to be one structure in (audio
01:38:50   4   drops).
01:38:50   5        But because our claims and our specification use
01:38:53   6   the word "only," it makes it very hard to find a buffer
01:38:58   7   that contains data blocks -- that only contains data blocks
01:39:04   8   if it had other types of information such as control
01:39:08   9   information.  That buffer just would not follow the claim
01:39:11  10   in that sense.
01:39:11  11        And then to your last point, Your Honor, about
01:39:15  12   there being an example of a one-buffer solution, well,
01:39:19  13   there isn't a one-buffer solution in the specification.
01:39:21  14   There's no example of one.  Every time we're talking about
01:39:24  15   a buffer, it's very explicit that we're talking about a
01:39:29  16   data buffer that contains data blocks and a control buffer
01:39:34  17   that contains control blocks.
01:39:36  18        THE COURT:  All right.  Let me ask everybody on
01:39:37  19   the connection that we have to make sure your devices are
01:39:43  20   muted.  We're getting a steady clicking audio-wise on my
01:39:49  21   end that makes it difficult to follow the oral arguments.
01:39:53  22   I'm still getting it.  Please double-check your devices,
01:39:56  23   make sure everybody is on mute unless you're speaking to
01:39:59  24   the Court.
01:39:59  25        All right.  Let's go on to the '151 patent, and

01:40:07  1  we'll begin with mapping the single low-rate traffic signal

01:40:14  2  to the single low-rate traffic OPU is performed using a

01:40:20  3  general framing procedure or other adaptation protocols.

01:40:25  4        Again, Huawei is proposing no construction

01:40:30  5  necessary, which seems to be their approach throughout.  So

01:40:32  6  let me start with Verizon that gives a proposed specific

01:40:35  7  construction, and let me hear their arguments in regard to

01:40:38  8  their construction.  And then I'll hear from Huawei in

01:40:41  9  response.

01:40:41  10        So I'll start with Verizon.

01:40:45  11        MS. ACHARYA:  Your Honor, I'll be handling this

01:40:47  12  term, as well.

01:40:48  13        And if you turn to the '151 slide deck that we

01:40:52  14  sent you at Slide 5, we set forth the dispute that's really

01:40:56  15  here.  And the dispute is whether the claim is limited to

01:41:02  16  GFP mapping and the two variants of that mapping, which is

01:41:06  17  GFP-T and GFP-F, or whether it can include any type of

01:41:10  18  adaptation protocol.

01:41:12  19        If you turn to Slide 7, and Slide 7 to 9 shows the

01:41:20  20  claim specification, and it demonstrates the fact that the

01:41:26  21  specification over and over again only refers to GFP map.

01:41:30  22  There is no teaching of any other type of mapping in the

01:41:33  23  specification, and it talks about GFP mapping and the two

01:41:37  24  variants that are described on Slide 9, GFP-F and GFP-T.

01:41:41  25        But other than those two type of mapping, the

01:41:45  1  specification does not explain how you would use any other

01:41:48  2  type of mapping with the invention disclosed in the '151

01:41:53  3  patent.

01:41:53  4       THE COURT:  That being the case, why couldn't

01:41:57  5  Huawei argue that what in effect you're attempting to do is

01:42:00  6  import a limitation from the specification into the claim

01:42:03  7  language?

01:42:03  8       MS. ACHARYA:  So what we would say is if you look

01:42:09  9  at the prosecution history, the examiner actually added an

01:42:15  10  amendment at the end of the very lengthy prosecution

01:42:19  11  history that followed with this patent.  And to put this

01:42:22  12  patent in allowance for issuance, the patent examiner

01:42:29  13  required that dependent (audio drops) be added to the

01:42:33  14  independent claim.

01:42:33  15       The original claim -- if you look on Slide 10 --

01:42:36  16  already had the word "mapping" in there.  In order to do

01:42:40  17  mapping, you have to use an adaptation protocol.  There's

01:42:44  18  no other way to do mapping.  You have to use this

01:42:46  19  adaptation protocol.

01:42:48  20       So as the claim was originally drafted, it would

01:42:50  21  have implicitly required the use of an adaptation protocol.

01:42:56  22  However, the examiner required that this dependent claim be

01:42:59  23  tacked on to the independent claim to put it in (audio

01:43:03  24  drops).  And what it did is it limited what those

01:43:07  25  adaptation protocols could be.  It said that it had to be

01:43:10   1   used using a general framing mapping procedure.

01:43:12   2           And the reason that other adaptation protocols

01:43:16   3   can't just be any other adaptation protocol is because

01:43:20   4   that's what the original claim said.  By including the word

01:43:25   5   "mapping," it effectively allowed for any other adaptation

01:43:30   6   protocol.

01:43:30   7           But the examiner said:  No, that was not okay.

01:43:32   8   We're going to add in this amendment to limit the scope of

01:43:35   9   what that claim is.

01:43:37  10           THE COURT:  All right.

01:43:38  11           MS. ACHARYA:  And another reason why -- oh, sorry,

01:43:42  12   Your Honor.  Did you have a question?

01:43:43  13           THE COURT:  Let me pause for a minute.  I'm

01:43:43  14   getting a message from my IT people that tells me they

01:43:46  15   believe that the clicking noise we're continuing to hear is

01:43:49  16   coming from Mr. Barkan on the line ending with 1803.

01:43:54  17           So I might ask Mr. Barkan to drop off and dial

01:43:59  18   back in.  Maybe we can avoid that --

01:44:00  19           MR. BARKAN:  Yes, I will do that, Your Honor.

01:44:02  20           THE COURT:  Thank you.

01:44:02  21           MR. BARKAN:  I will do that.  I'm sorry.

01:44:04  22           THE COURT:  Sorry for the interruption.

01:44:05  23           Go ahead, Ms. Acharya.

01:44:06  24           MS. ACHARYA:  No problem.

01:44:10  25           The problem with having just the term "other

01:44:14  1   adaptation protocols" in the claim is that it would render

01:44:18  2   the claim indefinite.

01:44:19  3          If you look on Slide 11, you can see our expert

01:44:22  4   said that there are thousands of different adaptation

01:44:25  5   protocols.  And even within the G.709 standard, our expert

01:44:32  6   looked at all the adaptation protocols, even within the

01:44:32  7   scope of the standard that's at issue here, which is the

01:44:36  8   G.709 standard.  There's 30 different adaptation protocols

01:44:42  9   even within that G.709 standard.

01:44:42  10          But these adaptation protocols aren't a

01:44:46  11   plug-and-play situation.  We can't just pick and choose one

01:44:48  12   adaptation protocol to just use with this invention.  Each

01:44:53  13   adaptation protocol is very specific to the application

01:44:55  14   that it's meant for.

01:44:56  15          So we have GFP that was set forth in this

01:45:03  16   specification, and that's because GFP was specifically

01:45:06  17   designed and used for this mapping of low-rate traffic.

01:45:09  18          If you tried to include another type of adaptation

01:45:12  19   protocol, you potentially have to change the structure --

01:45:15  20   you have to change the infrastructure.  You can't just use

01:45:18  21   another adaptation protocol without changing the

01:45:22  22   transmission steps that need to occur.  It's all very

01:45:25  23   application-specific.

01:45:28  24          And if you look on Slide 12, procedurally, what

01:45:32  25   happened in this case is our expert set forth in his

01:45:36  1   declaration, and then Huawei's expert got to respond to

01:45:39  2   that declaration after.  Our expert, as you can see at the

01:45:43  3   bottom of Slide 12, stated, you know, if we were going to

01:45:46  4   use another type of adaptation protocol such as the GMP

01:45:52  5   protocol, well, you wouldn't be able to just put GMP into

01:45:56  6   what was set forth in the '151 patent.  You would have to

01:45:59  7   change the structure.  You would have to make modifications

01:46:01  8   to the transmission steps.  It's not as simple as just

01:46:05  9   using another protocol.

01:46:06  10          And Huawei's expert didn't really respond to that.

01:46:09  11  His only response is:  Well, the 2009 standard had other

01:46:14  12  mapping techniques, such as the GMP, but he didn't explain

01:46:18  13  how he would use GMP within the '151 patent.  And as our

01:46:23  14  expert explained, you just can't do it.

01:46:24  15          So the problem with having other adaptation

01:46:31  16  protocols added to the end of this claim is that if it's

01:46:32  17  not bound by what's set forth in the specification, it

01:46:35  18  leads to a limitless number of -- numbers of mapping

01:46:39  19  protocols that could be used which won't work with this

01:46:43  20  claim or the specification which will render the claim

01:46:46  21  indefinite.

01:46:46  22          THE COURT:  So let me make sure I understand your

01:46:49  23  position.

01:46:49  24          You're telling me that it's not possible to map

01:46:54  25  except by using an adaptation protocol?

01:46:56  1          MS. ACHARYA:  Correct, Your Honor.  There's no

01:46:57  2  other way to map than to use an adaptation protocol, and

01:47:01  3  that's what the original claim had set forth.

01:47:03  4          THE COURT:  All right.  Let me hear a response

01:47:06  5  from Huawei, please.

01:47:07  6          MR. NEMUNAITIS:  Thank you, Your Honor.  Justin

01:47:13  7  Nemunaitis for Huawei.

01:47:13  8          So the dispute here is as to this claim language,

01:47:22  9  GFP or other adaptation protocols.  Verizon is not taking

01:47:29 10  the position that the plain meaning of that language is

01:47:34 11  that it means GFP or no other adaptation protocols, but

01:47:37 12  that is the claim scope that they're advocating for.  And

01:47:41 13  that's not an appropriate interpretation of this claim

01:47:43 14  language.

01:47:43 15          The inventors were very clear when they drafted

01:47:49 16  the specification.  They provided a number of examples

01:47:51 17  where GFP was used, but then they say in Column 11:  The

01:47:56 18  above GFP encapsulating and map -- mapping method may be

01:48:01 19  that of other feasible adaptation protocols encapsulating

01:48:01 20  formats and the corresponding GFP mapping module being

01:48:10 21  replaced by the mapping modules of other adaptation

01:48:14 22  protocols.

01:48:15 23          So there was clearly an intent to cover

01:48:18 24  embodiments that do not use GFP.  The question is:  If you

01:48:23 25  practice every limitation of the claims, is it met?  And

01:48:28  1   there's no requirement that GFP be used to meet all those

01:48:31  2   other limitations.

01:48:32  3            As to the prosecution disclaimer argument, the --

01:48:40  4   the back story there is that before the notice of

01:48:45  5   allowance, the examiner and the applicant conducted an

01:48:51  6   interview, and then the examiner proposed an amendment to

01:48:54  7   the claims.  The examiner proposed two amendments to the

01:48:56  8   claims, and those are shown in Slide 10 of Verizon's

01:49:00  9   presentation.

01:49:01  10           One amendment was to include this new limitation

01:49:01  11  requiring a bit rate of 1.238.

01:49:13  12           The other additional limitation was this -- this

01:49:16  13  statement about the mapping the low-rate traffic signal

01:49:19  14  using GFP or other adaptation protocols.

01:49:21  15           And if you look at the way that amendment is

01:49:24  16  shown, the examiner actually put in bold and underlined the

01:49:28  17  bit rate limitation and just put in underline the -- the

01:49:32  18  GFP or other adaptation protocols (beeping).

01:49:36  19           When you look at the examiner's notice of

01:49:41  20  allowance -- and this is in our Slide 18, but I can just

01:49:44  21  read it to the Court -- what the examiner says is:  The

01:49:50  22  prior art including the cited prior art in the IDS does not

01:49:54  23  disclose at least the specific limitation for the payload

01:49:57  24  for OPU having a bit rate of 1,23 -- it reads out the rest

01:50:02  25  of the numbers -- or having a size of 4 x 3,824.

01:50:08  1      And then it goes on to cite the specific numbers

01:50:11  2  of these bit rates.  Nowhere in there does the examiner say

01:50:16  3  that the notice of allowance is based on some requirement

01:50:19  4  of GFP.

01:50:20  5      Now, the standard for prosecution disclaimer is

01:50:22  6  very high.  There must be clear and unambiguous disclaimer.

01:50:27  7      In this case, the language itself that was added

01:50:29  8  does not say you need to use GFP and GFP only.  It tracks

01:50:35  9  the language of the specification, which says you need to

01:50:37  10  use GFP, or you can use other adaptation protocols.

01:50:41  11      So the -- the claim language itself can't

01:50:43  12  establish that disclaimer.

01:50:45  13      When you look at the notice of allowance, that

01:50:47  14  cannot establish the disclaimer because it doesn't mention

01:50:50  15  GFP at all.  So what we're left with is claim language

01:50:53  16  which on its face not even Verizon is arguing is limited to

01:50:57  17  GFP, and no clear disclaimer in either the prosecution

01:51:01  18  history or the specification, and so there's no reason for

01:51:04  19  a construction at that point.

01:51:06  20      THE COURT:  All right.  Anything further on this

01:51:08  21  term?

01:51:10  22      MS. ACHARYA:  Just briefly, Your Honor.  I just

01:51:14  23  want to point out the fact that, you know, even if the

01:51:17  24  inventor had wanted to include other adaptation protocols

01:51:19  25  as set forth in the specification that counsel just

01:51:22   1   referenced, that doesn't necessarily make the claim valid.

01:51:26   2   We still have to look at the canons of claim construction

01:51:28   3   to see if the claim would be indefinite as drafted by the

01:51:34   4   inventor.

01:51:34   5            And as you can see, the examiner made amendments.

01:51:36   6   They didn't -- he didn't just include the bit rate.  He

01:51:39   7   also included the additional limitation regarding the

01:51:42   8   mapping in this case.

01:51:44   9            So the examiner knew that even if that inventor

01:51:47  10   had wanted to include just any other adaptation protocol,

01:51:51  11   that wouldn't have been sufficient to put this claim in

01:51:53  12   allowance.

01:51:55  13            THE COURT:  All right.  Thank you, counsel.

01:51:57  14            Let's move on to the next disputed term, which

01:52:01  15   appears to be "rate rank," regarding the '151 patent,

01:52:08  16   Claims 1 and 6.

01:52:09  17            Again, Huawei's proposal is no construction

01:52:12  18   necessary.  And Verizon's given a specific proposed

01:52:17  19   construction instruction.  So I'll ask Verizon to address

01:52:20  20   this first, and then I'll hear a response from Huawei.

01:52:23  21            MS. ACHARYA:  Your Honor, if you could turn to

01:52:29  22   Slide 18 in our deck, it shows you what the dispute is in

01:52:35  23   this situation.  With respect to this term, the dispute is

01:52:39  24   whether rate rank can cover traffic rates known at the time

01:52:42  25   of the '151 patent's filing or if it includes all future

01:52:47  1  definitions of rate rank, such as all future and new

01:52:52  2  traffic rates that were contemplated for by the G.709

01:52:56  3  standard that weren't in existence at the time of the '151

01:53:01  4  patent filing.

01:53:02  5          THE COURT:  Is this -- this is the after arising

01:53:02  6  technology dispute that seems to be replete through most of

01:53:05  7  what we have today, correct?

01:53:06  8          MS. ACHARYA:  Correct.  And this -- this issue

01:53:08  9  comes up in a couple of different patents, but I believe

01:53:11  10  we're only going to be discussing it today in argument with

01:53:14  11  respect to the '151 patent.

01:53:16  12          THE COURT:  Well, I've seen it in several places

01:53:18  13  in preparing for today, but we may have narrowed it down.

01:53:21  14  Go ahead.

01:53:22  15          MS. ACHARYA:  Correct.  Correct.  It is in several

01:53:24  16  patents.

01:53:24  17          If you look at Slide 19, you can see the parties

01:53:30  18  agree that rate rank needs to be defined by the G.709

01:53:34  19  standard.  It only really has a definition with respect to

01:53:37  20  that standard, and that's not in dispute.

01:53:39  21          The dispute, though, is whether we're going to

01:53:41  22  look at the traffic rates that define that rate rank at the

01:53:46  23  time of the invention or all future traffic rates.

01:53:49  24          The canons of claim construction dictate that when

01:53:51  25  you're looking at claim construction, you look at what was

01:53:55  1  known at the time of the filing.  And at the time of the

01:53:57  2  filing in this case, the standard defined a set of traffic

01:54:00  3  rates that encompassed rate rank.

01:54:04  4       Our second case here, the Promethean case, was

01:54:10  5  also a standards case which I believe Your Honor issued.

01:54:13  6  And in that case -- that case is very similar to the case

01:54:16  7  here.  In that case, there was a standard as of the

01:54:19  8  effective filing date which defined a set of materials as

01:54:23  9  Class A materials.  Thereafter, there were various versions

01:54:26  10  of the standard that had different materials that set --

01:54:30  11  that were set forth in Class A.

01:54:33  12       But because that invention was specific to the

01:54:35  13  materials that were set forth in Class A at that time, this

01:54:40  14  Court said that the materials that were defined as Class A

01:54:44  15  were going to be defined at the time of the filing.

01:54:47  16       And that's exactly the situation that we have

01:54:49  17  here.  We have a set of rate ranks that were defined at the

01:54:53  18  time -- time of filing, and we believe that those are the

01:54:57  19  rate ranks that should be applied to the definition here.

01:54:59  20       If you look on Slide 20, you'll see this issue.

01:55:04  21  At the time of filing, the G.709 standard set forth a

01:55:08  22  limited number of traffic rates, and that was associated

01:55:12  23  with, for example, k=0, 1, 2, 3, and that was for traffic

01:55:18  24  rates under 2.5 gigabits, 2.5 gigabits per second, 10

01:55:22  25  gigabits per second, and 40 gigabits per second.

01:55:25  1          At the bottom of this slide, you can see Huawei's

01:55:28  2  opening brief, and it will show you what the future

01:55:30  3  versions of the G.709 standard now include for rate rank.

01:55:34  4  There are these new traffic rates that have now been part

01:55:37  5  of the standard, such as ODU-Flex.  That's just one

01:55:42  6  example.

01:55:43  7          Well, ODU-Flex, if you -- if you say that future

01:55:45  8  versions of the standard can be included in the patent,

01:55:48  9  well, ODU-Flex is just a completely different type of

01:55:52  10  technology.  It's not even just a new traffic rate.  It's

01:55:55  11  actually a way to allow client rates that are separate from

01:56:00  12  rates defined by the OTN to be able to transmit those

01:56:03  13  traffic rates on the OTN.  It created kind of a hybrid ODU

01:56:06  14  that handles these client signals.

01:56:09  15          Well, in order to be able to handle this, you need

01:56:13  16  different structure.  You need different experiments to be

01:56:17  17  put into place, different types of transmission steps.

01:56:21  18  None of that is defined for in the '151 patent.

01:56:24  19          The '151 patent, the structure that's set forth in

01:56:26  20  there would not be able to use these new traffic rates that

01:56:30  21  are set forth here, the structure that's defined in the

01:56:33  22  specification.

01:56:33  23          So that's really the issue here is you can't just

01:56:36  24  put in these new traffic rates.  This isn't a generic term

01:56:41  25  that we're trying to add in.  These are very specific

01:56:44  1  traffic rates that have specific structures that are

01:56:47  2  required in order to implement.

01:56:48  3        And, Your Honor, Huawei has a number of cases

01:56:55  4  cited in their briefs, but the differentiating factor

01:57:00  5  between what's cited in their briefs and what's at issue

01:57:03  6  here in, for example, the Promethius -- Promethean case

01:57:05  7  that this Court issued is that in those cases, the terms

01:57:10  8  that were at issue in dispute were more generic terms, if

01:57:14  9  we're talking about a signal or a mixer.

01:57:16  10        Here we're talking about something very specific

01:57:18  11  where that definition has expanded over time where the new

01:57:23  12  traffic rates that are set forth in that definition no

01:57:26  13  longer can be implicated or can be used within the

01:57:31  14  infrastructure set forth within the '151 patent.

01:57:34  15        THE COURT:  All right.  Anything further?

01:57:36  16        MS. ACHARYA:  Nothing further, Your Honor.

01:57:39  17        THE COURT:  Let me hear a response from Huawei,

01:57:42  18  please.

01:57:42  19        MR. NEMUNAITIS:  This dispute really comes down to

01:57:49  20  Verizon's effort to -- to create tension between these two

01:57:52  21  principles of -- of patent law.

01:57:54  22        One is that claims are generally able to cover

01:57:56  23  after arising technology if the language is broad enough,

01:58:01  24  the other being that the language of the claim has the

01:58:05  25  meaning it had when the patent was filed.

01:58:06  1          I think these two principles generally are not in

01:58:09  2   conflict.  The reason why is -- you know, think about a

01:58:12  3   patent that contains the word "processor."  If that patent

01:58:16  4   is a hundred years old, it -- it's going to have a

01:58:18  5   different meaning, that word, as compared to a patent that

01:58:21  6   was filed today.

01:58:22  7          And so that might be a scenario where the

01:58:26  8   construction that applies to the hundred-year-old patent is

01:58:28  9   going to be different from the construction that applies to

01:58:32  10  a 2020 patent.

01:58:32  11         But if you have a patent that's 20 years old that

01:58:37  12  contains the word "processor," that doesn't mean that the

01:58:42  13  word "processor" has changed so much in the past 20 years

01:58:46  14  that you would need a different construction.  It may be

01:58:49  15  that in the year 2000, the best processor on the market was

01:58:53  16  a Pentium 4, but that doesn't mean that you need to

01:58:57  17  construe that term "processor" to mean a CPU that has the

01:58:59  18  power of a Pentium 4 but nothing faster.

01:59:02  19         But that's what Verizon is trying to do in this

01:59:04  20  case.  And it's not the case that when Intel comes out with

01:59:09  21  a Pentium 5, we all need to go revise all the dictionaries

01:59:13  22  and say, okay, there's a new meaning of the word

01:59:17  23  "processor."  It's just that the set of things that can

01:59:20  24  infringe a claim or that can meet that particular

01:59:22  25  limitation has grown as technology develops.  And it's a

01:59:24   1   basic principle of patent law that if your claims are

01:59:28   2   drafted broadly enough, you can encompass claim scope over

01:59:32   3   those new changes in technology.

01:59:34   4        As to this term "rate rank," this is not a G.709

01:59:45   5   specific word.  I would refer Your Honor to a few

01:59:48   6   statements in the specification.

01:59:52   7        In Column 5, Line 49, it refers to the GE or FC

01:59:59   8   traffic signals are in the rate of 1G rank.  In Column 6,

02:00:03   9   there's a reference to the rank of FC and FE ranks.

02:00:07  10        The reason I mention that is because as this term

02:00:10  11   is used in the patent, it just refers to an approximate

02:00:17  12   value of the bit rate of a signal.

02:00:19  13        So if data being met is transferred at 1.114 or

02:00:25  14   73, you know, or some number, everyone knows that it's

02:00:27  15   easier to refer to it as gigabit ethernet.  And so that

02:00:30  16   is -- that's the rate rank of the signal.  And you can use

02:00:32  17   that term to refer to OTN signals, G.709 signals, or -- or

02:00:37  18   other types of signals.  It's just an easier way to talk

02:00:41  19   about these things.

02:00:41  20        THE COURT:  Let me ask you this, counsel.

02:00:43  21   Ms. Acharya told me that the parties agree that rank --

02:00:48  22   rate rank is defined in the G.709 standard.  Do you differ

02:00:54  23   with that in light of what you just told me, or do you

02:00:58  24   agree with that?

02:00:58  25        MR. NEMUNAITIS:  I differ with that, Your Honor.

02:01:00   1          The -- the term "rate rank" is a more general

02:01:03   2   term.  I would agree that the G.709 standard specifies

02:01:07   3   certain rate ranks that can be used, and that has changed

02:01:10   4   over time.  But that's different from saying that the

02:01:12   5   standard defines the phrase "rate rank."

02:01:17   6          I go back to my processor example.  The standard

02:01:20   7   doesn't define what a processor is, or, you know, Intel

02:01:23   8   doesn't define what a processor is, but it may make, you

02:01:27   9   know, a certain set of devices that fit that definition.

02:01:30   10          THE COURT:  All right.  What else?

02:01:34   11          MR. NEMUNAITIS:  I would just like to address the

02:01:36   12   caselaw.

02:01:37   13          The -- the -- the closest case on point is a

02:01:41   14   Federal Circuit case, SuperGuide, where the term at issue

02:01:44   15   was "regularly received television signal."  At the time

02:01:48   16   that patent was filed, the standard for transmitting

02:01:53   17   television signals required an analog signal.  After the

02:01:56   18   patent was filed, then digital television signal standard

02:01:59   19   was developed.  And the Federal Circuit said that it was

02:02:04   20   appropriate for that term to encompass these new digital

02:02:08   21   television signals even though they did not exist at the

02:02:12   22   time the patent was filed.

02:02:12   23          In the Celltrace case, the Court reached a similar

02:02:12   24   law in which it was referred -- they used the phrase

02:02:19   25   GSM-compatible cell phone.  And there's other cases, as

02:02:20   1   well.

02:02:21   2          The one case that Verizon cites to support their

02:02:24   3   position is the Promethean case.  This was a Judge Payne

02:02:29   4   case.  And I would really like to go into the details of

02:02:31   5   that case just a little bit because it is a very different

02:02:34   6   scenario.  It really was not dealing with the after-arising

02:02:37   7   technology issue that we have here.

02:02:38   8          In that case, there was a standardized test for

02:02:43   9   measuring the thermal resistance of material, and whether

02:02:47  10   or not you passed the test decided whether or not you get

02:02:50  11   to declare your material Class A.  The inventor in that

02:02:54  12   case found that the test was really not very good for a

02:02:58  13   certain type of material because it allowed the test to be

02:03:02  14   conducted with this wire mesh support, and that could

02:03:05  15   create misleading results.

02:03:07  16          So what -- what he proposed in that case was I've

02:03:10  17   come up with this new material that can achieve Class A

02:03:15  18   certification without using the wire mesh.  And so he

02:03:18  19   developed this new material.

02:03:19  20          After the patent was filed, other people in the

02:03:24  21   industry recognized we've got this problem with the wire

02:03:27  22   mesh.  They revised the standard to prohibit people from

02:03:30  23   using that wire mesh.

02:03:32  24          The dispute there was that the claims referred to

02:03:35  25   the standard.  And the Defendant was trying to say, well,

02:03:38  1   look, these claims refer to the standard.  That means they

02:03:42  2   need to go back and encompass all the prior art that used

02:03:46  3   this wire mesh.

02:03:48  4          The Court said, no, that defeats the whole purpose

02:03:51  5   of this patent.  The whole purpose of the patent was

02:03:53  6   getting rid of the wire mesh, and so I'm not going to

02:03:56  7   change the claims to cover the prior art.  I'm going to

02:03:59  8   keep them focused on what the invention is, which is

02:04:02  9   getting rid of this wire mesh.

02:04:05  10         And so the Court's construction there specifically

02:04:07  11  said that this material -- the term at issue covers a

02:04:12  12  material that passes this test without the wire mesh.

02:04:15  13         There's no indication that the parties briefed the

02:04:19  14  SuperGuide issue or after-arising technology issue.  The

02:04:22  15  Court didn't cite that case.  And so I really don't think

02:04:25  16  that's a sound example to look to when -- when analyzing

02:04:30  17  the issue here in this case.

02:04:32  18         THE COURT:  All right.  What else?

02:04:32  19         MR. NEMUNAITIS:  Your Honor --

02:04:39  20         MS. ACHARYA:  Your Honor, if I could -- sorry, go

02:04:41  21  on, Justin.

02:04:42  22         MR. NEMUNAITIS:  Unless Your Honor has further

02:04:44  23  questions, I don't have any.

02:04:45  24         THE COURT:  All right.  Then let me ask

02:04:48  25  Ms. Acharya if she has any brief follow-up.

02:04:50  1        MS. ACHARYA:  Just briefly, Your Honor.

02:04:51  2        It is my understanding the parties did not have a

02:04:55  3  dispute as to rate rank being defined by the standard.  If

02:05:00  4  you look at their opening brief, on Page 6, their first

02:05:04  5  sentence under rate rank says:  The parties agree that the

02:05:07  6  term "rate rank" refers to the set of bit rates

02:05:09  7  standardized in the G.709 standard.

02:05:11  8        So the fact that there is a dispute as to how that

02:05:14  9  term was defined is new to me here.  I wasn't trying to

02:05:19  10  misrepresent anything.  I was just going off of what was in

02:05:23  11  Huawei's briefing.

02:05:24  12        Second, with respect to the processor example that

02:05:27  13  counsel mentioned, you have to look at the specification

02:05:31  14  and how that term is used in the specification.  In the

02:05:37  15  generic example that counsel gave, yeah, you may be able to

02:05:41  16  use an after-arising processor if the specification

02:05:45  17  provided enough implementation and enough knowledge for one

02:05:48  18  of ordinary skill in the art to use that after-arising

02:05:51  19  technology within the scope of the specification.

02:05:52  20        The problem that we have here is that the '151

02:05:55  21  patent is very specific to the structure that was defined

02:05:58  22  by the G.709 standard at that time.  The standard has

02:06:02  23  evolved a lot since then.  And like I mentioned, it now

02:06:07  24  includes rate ranks, such as OD-Flex, which has a

02:06:11  25  completely different structure which wasn't contemplated

02:06:15  1    for by the '151 patent and wouldn't work within the

02:06:18  2    confines of the '151 patent.  So you really have to look at

02:06:23  3    what is set forth in the specification and what that patent

02:06:25  4    provides.

02:06:25  5            And that's it, Your Honor, from my end.

02:06:27  6            THE COURT:  How would you respond to the argument,

02:06:33  7    Ms. Acharya, that what you've given me today really is more

02:06:37  8    of an enablement argument than it is a claim construction

02:06:40  9    argument?

02:06:40  10           MS. ACHARYA:  We believe that this argument needs

02:06:45  11   to be defined as a claim construction argument because it

02:06:47  12   defines the scope of what is rate rank in order to be able

02:06:51  13   to tell the jury clearly what this term is within the

02:06:54  14   claim.  Otherwise, rate rank does not really have much of a

02:06:57  15   definition, even within the '151 patent.

02:07:01  16           The reason for this construction is really to

02:07:03  17   provide a little more clarity for the jury as to what this

02:07:06  18   term is that's used over and over within this claim and the

02:07:09  19   specification.

02:07:10  20           THE COURT:  All right.  All right.  Let's move on,

02:07:13  21   then.  Our next disputed term for argument, per the

02:07:18  22   parties' priority list, appears to be "time slot" from the

02:07:26  23   '982 patent, Claim 1.

02:07:27  24           And let me hear argument from Verizon first, then

02:07:34  25   I'll hear a response from Huawei.

02:07:38  1          MR. STAFFORD:  Good afternoon, Your Honor.  This

02:07:40  2  is Patrick Stafford for Verizon.  I'll be handling the

02:07:43  3  argument for the "time slot" term.

02:07:45  4          THE COURT:  Good afternoon, Mr. Stafford.  Please

02:07:48  5  proceed.

02:07:49  6          MR. STAFFORD:  If you turn to Slide 22 of

02:07:49  7  Verizon's '982 patent presentation, (audio drops) the term

02:07:55  8  "time slot."  Specifically what's shown here is whether the

02:07:59  9  term "time slot" should be construed as its plain ordinary

02:08:08  10  (beeping) to be construed to a tributary slot --

02:08:09  11          THE COURT:  Let me stop you --

02:08:09  12          MR. STAFFORD:  Yes.

02:08:10  13          THE COURT:  Let me stop you, Mr. Stafford.  The

02:08:13  14  same clicking that we've been fighting this afternoon has

02:08:17  15  reappeared.  After Mr. Barkan dropped off, it went away.  I

02:08:21  16  don't know if Mr. Barkan is back.  I don't know if there's

02:08:24  17  some other reason why, but the same feedback on this end

02:08:28  18  has reappeared.  And, A, it impacts the Court's ability to

02:08:33  19  follow your argument; and, B, it's very annoying.  So if we

02:08:39  20  could find a way to delete this feedback clicking on my

02:08:44  21  end, I would appreciate it.

02:08:46  22          Well, it went away.  I don't know what somebody

02:08:49  23  did, but let's continue.

02:08:50  24          Go ahead, Mr. Stafford.

02:08:54  25          MR. STAFFORD:  Thank you, Your Honor.

02:08:54   1          As addressed in Verizon's briefing, Huawei's

02:08:57   2   proposed construction is not supported by the intrinsic

02:09:00   3   evidence.  As shown on Slide 23 of Verizon's presentation,

02:09:05   4   the claim with the term "time slot" is shown.  Here it's

02:09:09   5   only shown in Claim 1 because that's the only claim that

02:09:12   6   uses the term "time slot."  "Time slot" is not used in the

02:09:17   7   specification, and the specification includes no definition

02:09:19   8   for time slot as meaning a tributary slot.

02:09:22   9          Instead, as is clear from Claim 1, time slot is

02:09:28   10  used to mean its plain and ordinary meaning to one of

02:09:32   11  ordinary skill in the art at the time of the filing the

02:09:35   12  '982 patent.

02:09:35   13         As shown on Slide 24 in Verizon's presentation,

02:09:39   14  time slot has a clear meaning to one of ordinary skill in

02:09:42   15  the art in the networking communications field.

02:09:44   16  Specifically, the term "time slot" means a period of time.

02:09:49   17  In particular, it means a fixed period of time during which

02:09:52   18  data is transmitted or received.  The term "time slot" does

02:09:56   19  not refer to a physical structure like a tributary slot.

02:10:00   20  Instead, it is a period of time.

02:10:02   21         The plain and ordinary meaning of the term "time

02:10:06   22  slot" is further confirmed by the dictionary definitions at

02:10:10   23  the time of the filing of the '982 patent.

02:10:13   24         On Slide 25 of Verizon's presentation, the Newton

02:10:18   25  Telecom Dictionary definition is provided which also

02:10:21  1  confirms that time slot is a period of time.  In

02:10:24  2  particular, it's a brief moment in time during which the

02:10:27  3  data is transmitted or received.

02:10:29  4          And, again, here this definition proves that time

02:10:33  5  slot is not referring to a physical data structure like a

02:10:35  6  tributary slot.  Instead, it's a period of time.

02:10:38  7          On Slide 26 of Verizon's presentation, we

02:10:44  8  addressed the different claims that are at issue in the

02:10:47  9  '982 patent.  As shown here, the term "time slot" is used

02:10:50  10  in Claim 1, but the term "tributary slot" is used in Claims

02:10:54  11  4, 5, 8, 9, 11, 12, and 14.

02:10:58  12          As the parties have briefed and they agree,

02:11:03  13  tributary slot refers to a physical structure that's

02:11:07  14  defined by the G.709 standard, but time slot does not refer

02:11:11  15  to a tributary slot and does not have the same meaning as a

02:11:14  16  tributary slot because it's used in the claims as -- and

02:11:17  17  tributary slot is also used in the claims, and they're

02:11:20  18  presumed to have different meanings.

02:11:21  19          THE COURT:  But within -- within the context of

02:11:24  20  the OTN art, isn't it fair to say that time slot and

02:11:28  21  tributary slot are the same thing?  Do you agree with that

02:11:32  22  or disagree?  And if not, why?

02:11:37  23          MR. STAFFORD:  No, I don't agree with that, Your

02:11:39  24  Honor.

02:11:39  25          In the OTN art, time slot is still referred to in

02:11:43  1   the networking communications field.  So time slot is still

02:11:46  2   a period of time.

02:11:47  3          Tributary slot is a physical structure, and OTN

02:11:50  4   art is defined by the G.709 standard.  And the G.709

02:11:56  5   standard has a specific definition for tributary slot

02:11:58  6   (beeping) codified in the G.709 standard, and it's a coined

02:12:02  7   term for that standard.

02:12:03  8          So one of ordinary skill in the art in the OTN

02:12:05  9   field would understand that time slot still exists, still

02:12:07  10  is used in the OTN field to mean a period of time, not to

02:12:11  11  mean a physical structure as a data structure which would

02:12:15  12  be a tributary slot used in the G.709 standard.

02:12:18  13         THE COURT:  All right.

02:12:22  14         MR. STAFFORD:  And, Your Honor, on Slide 27, we

02:12:25  15  just provide the legal authority that also confirms that

02:12:28  16  there's a presumption that claim terms are presumed to have

02:12:31  17  different meanings within the claims.

02:12:34  18         So here, time slot and tributary slot are presumed

02:12:37  19  to have different meanings.  And we know that Huawei has

02:12:39  20  not proven that this presumption is overcome here for time

02:12:44  21  slot and tributary slot terms.

02:12:52  22         And unless Your Honor has any other questions,

02:12:55  23  that is Verizon's argument on time slot.

02:12:58  24         THE COURT:  All right.  Let me hear from Huawei,

02:13:03  25  please.

02:13:03  1         MR. NEMUNAITIS:  Your Honor hit on the key issue

02:13:05  2  with respect to this dispute which is whether or not these

02:13:09  3  terms are interchangeable in the OTN field.  That's a

02:13:12  4  question of fact, and so I'd like to go through the

02:13:15  5  evidence that both sides have presented to see how the

02:13:18  6  Court can weigh the evidence.

02:13:20  7         In our slide presentation, we identify some of

02:13:22  8  this evidence, and so I'll -- I'll refer to the slide

02:13:25  9  numbers in our presentation but then also read through the

02:13:28  10  important points here.

02:13:29  11         We submitted the declaration -- and I'm sorry,

02:13:33  12  Your Honor, I'm on Slide No. 38 of our presentation if you

02:13:39  13  would like to follow along.

02:13:40  14         We submitted the declaration of Dr. Bortz,

02:13:44  15  qualified expert familiar in the field of OTN.  No attack

02:13:48  16  on his credentials there.  He testified that after

02:13:50  17  providing an explanation of the history of these terms, how

02:13:53  18  they're used to refer to the concepts in G.709, which I

02:13:58  19  won't read you all of that, but his conclusion is for these

02:14:02  20  reasons, the terms "tributary slot" and "time slot" are use

02:14:06  21  interchangeably in the OTN field.

02:14:07  22         Mr. Bortz also analyzed two documents from the

02:14:13  23  ITU.  That's a standards setting body that sets forth the

02:14:17  24  G.709 standard.

02:14:18  25         The first of those documents is the official G.709

02:14:25  1   tutorial presented by the ITU.  In Paragraph 7 of his

02:14:28  2   declaration, he states:  The G.709 tutorial prepared by the

02:14:33  3   ITU itself refers to tributary slots as time slots.

02:14:37  4          At Page 40, for example, it says:  Thus, we have

02:14:39  5   to account for a data rate mismatch of 144,067 rate per

02:14:44  6   second by stuffing.  This stuffing is done on a multi-frame

02:14:45  7   basis.  Each time slot is stuffed once per four frames.

02:14:50  8   Mr. Bortz explains that that refers to the tributary slots

02:14:54  9   defined in the G.709 standard.

02:14:57  10         He also refers to the G.798 standard which is a

02:15:02  11  related standard that refers back to the G.709 standard.

02:15:05  12  Again, I won't read through the -- the technical language,

02:15:08  13  but he, again, shows examples of how this document from the

02:15:12  14  ITU also uses time slots and tributary slots as

02:15:15  15  interchangeable terms.

02:15:16  16         We also submitted the testimony of Verizon's IPR

02:15:19  17  expert, Dr. Min, who testified that the G.709 standard

02:15:24  18  multiplexes signals by combining multiple transport

02:15:25  19  structures of one k index into a single transport structure

02:15:29  20  of a higher k index that is a higher bit rate which has

02:15:32  21  been divided into time slots known as tributary slots.

02:15:36  22  That's in Paragraph 34 of his declaration.

02:15:41  23         Verizon's also submitted evidence on this issue.

02:15:46  24  They submitted the expert's declaration from Dr. Ralph.

02:15:50  25  When you look at his declaration, though, and I won't read

02:15:53  1  through all of it, what he does is he reads through

02:15:57  2  portions of the patent, he reads through the dictionary

02:16:00  3  definition that Verizon presented in the argument you heard

02:16:04  4  just now, and he says:  Based on this dictionary

02:16:06  5  definition, I believe that that provides a reasonable

02:16:10  6  definition of the term "time slot."

02:16:12  7          At no point does he dispute that in the OTN field,

02:16:16  8  these two terms are used interchangeably.

02:16:19  9          And when you look at that dictionary definition,

02:16:23  10  that comes from Newton's Telecom Dictionary.  That is a

02:16:28  11  general dictionary for telecom concepts.  It's not

02:16:32  12  something specific to OTN.

02:16:34  13          So in resolving this as a fact issue, you have

02:16:38  14  declarations from two different experts, official documents

02:16:41  15  from the ITU, and that is -- it needs to be weighed against

02:16:46  16  this general dictionary and testimony from Verizon's expert

02:16:49  17  which does not address this issue and does not dispute the

02:16:52  18  testimony from the other experts.

02:16:53  19          And so for that reason, we believe that we have

02:16:58  20  shown that the more reasonable construction is to identify

02:17:05  21  these terms as interchangeable.

02:17:07  22          I would also refer briefly to the intrinsic

02:17:10  23  evidence.  One of the things the parties point out in the

02:17:13  24  briefing is that there was a parent application to the '982

02:17:15  25  that contains an identical specification, except it uses

02:17:19  1  the term "time slot" in place of "tributary slot."

02:17:22  2       So, for example, the '982 patent explains that an

02:17:27  3  HO OPU2 is divided into eight 1.25G tributary slots.  The

02:17:32  4  parent application says that an HO OPU2 is divided into

02:17:39  5  eight 1.25G time slots.

02:17:39  6       There's been no evidence from Verizon that those

02:17:42  7  statements are referring to two different things.  Instead,

02:17:44  8  the most reasonable inference from all the evidence is that

02:17:47  9  these two terms were used interchangeably in the

02:17:51 10  applications just as they are in the industry.

02:17:53 11       And so for that reason, we believe these two terms

02:17:57 12  should be interpreted as interchangeable.

02:18:00 13       THE COURT:  All right.  Anything further for

02:18:03 14  Verizon, Mr. Stafford?

02:18:07 15       MR. STAFFORD:  Yes, just to first address the

02:18:10 16  expert declaration argument.  The Dr. Ralph declaration

02:18:13 17  that Huawei cites does not say that tributary slots and

02:18:17 18  time slots are used interchangeably.  Instead, it clearly

02:18:21 19  states that time slot has a relevant meaning to one of

02:18:21 20  ordinary skill in the art, and it provides that meaning as

02:18:23 21  being a fixed period of time.

02:18:24 22       Additionally, Dr. Bortz's declaration -- it's two

02:18:32 23  different documents.  But, again, Huawei doesn't prove that

02:18:35 24  the word "time slot" is used interchangeably with

02:18:39 25  "tributary slot."  Instead, these documents show that

02:18:42   1   tributary slot exists within the G.709 standard, and it's

02:18:44   2   defined in the G.709 standard.  And that time slot is not

02:18:48   3   used in the G.709 standard and is not used interchangeably

02:18:52   4   within the G.709 standard for tributary slot.

02:18:53   5          And then the final argument that they made about

02:18:56   6   the intrinsic evidence, there is no evidence showing that

02:19:00   7   time slot and tributary slot were treated interchangeably

02:19:04   8   by Huawei.  In fact, the evidence shows the contrary

02:19:07   9   because they amended the specification or used the term

02:19:10   10  "time slot" to change it to say "tributary slot."  So they

02:19:12   11  clearly meant that tributary slot was different.  If they

02:19:16   12  thought it was the same thing, they wouldn't have amended

02:19:19   13  the specification to state that it was tributary slot when

02:19:22   14  they filed the '982 patent application.

02:19:27   15         THE COURT:  All right.  Thank you, counsel.

02:19:28   16         Let's move on.  The next term for argument is

02:19:38   17  going to be out of the '236 patent, and that's "client

02:19:51   18  signal byte number Cn."

02:19:57   19         Let me hear from Huawei on this one first.  We'll

02:20:00   20  change the order a little bit.  This would be Mr. Hamad?  I

02:20:00   21  see your lips moving, but I don't hear you, sir.

02:20:20   22         MR. HAMAD:  Yes, Your Honor, Hamad Hamad for

02:20:22   23  Huawei.

02:20:22   24         THE COURT:  Now I hear you.  Please continue.

02:20:24   25         MR. HAMAD:  Thank you, Your Honor.

02:20:26  1          Your Honor, may I inquire if you have our slide

02:20:30  2  deck for the claim construction hearing for Huawei?

02:20:41  3          THE COURT:  I'm sure I do.  Just a moment.

02:20:46  4          I've got it, counsel.

02:20:48  5          MR. HAMAD:  Thank you, Your Honor.

02:20:49  6          For Your Honor's reference, I'm starting on Slide

02:20:53  7  44.

02:21:03  8          THE COURT:  I'm there.

02:21:04  9          MR. HAMAD:  Thank you, Your Honor.

02:21:04  10          I'm presenting argument on the '236 and '505

02:21:09  11  patents.  And starting at Slide 45, we have the first term,

02:21:09  12  "client signal byte number."  The primary dispute here is

02:21:15  13  whether the term should be limited to a specific equation

02:21:19  14  from one version of the standard as Verizon proposes.

02:21:21  15          On Slide 46, I just wanted to put things in

02:21:26  16  perspective, comparing the standard that Verizon relies on

02:21:31  17  with the '236 patent.

02:21:33  18          So this is the December 2009 version of the

02:21:37  19  standard, and you can see on the right, the '236 patent has

02:21:41  20  a priority date going back to 2007 on the PCT in '08.  So

02:21:47  21  the standard they rely on post-dates the '236 patent.

02:21:50  22          What -- what Verizon essentially relies on

02:21:55  23  actually is an internal ITU working document called the

02:21:58  24  Living List for 2006.  And the theory is that there were

02:22:04  25  equations proposed in the Living List document that were

02:22:07  1  ultimately adopted in the 2009 standard and that this

02:22:12  2  defines and fixes in time the meaning of the term "client

02:22:19  3  signal byte number."

02:22:20  4       Notably, the specification itself does not define

02:22:24  5  or reference the term "client signal byte number" with

02:22:28  6  respect to any particular equation.

02:22:30  7       On Slide 47, here are some examples of how the

02:22:35  8  specification mentions this -- this claim term.  Again, it

02:22:38  9  describes the full claim term, "client signal byte number

02:22:42  10  Cn," and there's no specific definition as to a particular

02:22:47  11  equation.

02:22:47  12       THE COURT:  Let me ask you a question, counsel.

02:22:50  13       MR. HAMAD:  Yes, Your Honor.

02:22:51  14       THE COURT:  Is Cn in the patent, in your view,

02:22:55  15  co-existent with Cn in the standard?

02:22:58  16       MR. HAMAD:  Yes, it's consistent with -- with Cn

02:23:01  17  in the standard.  I think the parties agree on that.  I

02:23:05  18  think the issue is whether it should be limited to a

02:23:07  19  particular way to calculate Cn and -- and also fixed in

02:23:10  20  time to one version of the standard.

02:23:12  21       THE COURT:  All right.  Continue with your

02:23:15  22  argument, please.

02:23:16  23       MR. HAMAD:  Thank you.

02:23:17  24       I'm on Slide 48, Your Honor.  And here you can see

02:23:22  25  the excerpt of a standard that -- that Verizon relies on.

02:23:26  1   And so Verizon's initial proposal draws from the Section

02:23:33  2   D.1 basic principles, and it takes just that first equation

02:23:37  3   D-1.

02:23:39  4          Huawei's expert, Dr. Bortz, in his declaration and

02:23:42  5   in Huawei's opening brief, we point out that even on the

02:23:45  6   same page, there were other equations that -- that

02:23:47  7   referenced Cn.  And the two that we pointed out were D-2

02:23:51  8   and D-6.

02:23:52  9          In response, Verizon responded that it would not

02:23:55  10  be opposed to including those two equations in its

02:23:58  11  construction.

02:23:59  12         So it kind of recognized that -- that D-1 alone

02:24:04  13  wouldn't work, and there's actually a technical reason for

02:24:07  14  that in that the Cn value that's transported in the OTN has

02:24:11  15  to be an integer value.  And so that's what you actually

02:24:14  16  see in Equation D-2.  It's a function of that same

02:24:17  17  expression to ensure that you have an integer to -- to

02:24:23  18  transmit.

02:24:23  19         The issue that -- even if you were to pack more

02:24:25  20  equations into the construction, it doesn't fix the -- the

02:24:28  21  problem.

02:24:30  22         On Slide 49, one of the things that Verizon's

02:24:34  23  proposal doesn't account for is even in the same annex of

02:24:38  24  the standard that they're relying on, in this section

02:24:40  25  applying a GMP protocol in OTN.  Well, this patent is about

02:24:47  1  optical transport networks, so this section is relevant.

02:24:50  2  And it has its own equations.  Some of those equations have

02:24:55  3  expressions or have algebraic exercises that can be done to

02:25:00  4  also develop an expression for Cn.

02:25:00  5       There -- also in both in Section D.2 and then in

02:25:04  6  D.1 that Verizon relies on -- and now I'm on Slide 50 --

02:25:08  7  there are a narrative non-equation descriptions in the

02:25:13  8  standard of Cn.  And so at -- Slide 50 actually shows the

02:25:16  9  page that Verizon relies on for equation D-1.  And

02:25:20  10  Verizon's proposal does not account for these descriptions

02:25:23  11  or does not include them, and it just has this particular

02:25:26  12  way to calculate it.

02:25:27  13       Slide 51, Your Honor, we tried to show what

02:25:33  14  Verizon's proposal would look like in the claim language --

02:25:36  15  Claim 1, if you were to take the equation D-1 and plug it

02:25:40  16  in place of the -- of the challenged claim term.

02:25:43  17       So what you see here is you're introducing new

02:25:46  18  variables, and it makes the claim language needlessly

02:25:51  19  complex and confusing.  It's also unhelpful and potentially

02:25:54  20  confusing to the jury who's trying to reach determinations

02:25:55  21  of infringement.  And -- and this is just one equation,

02:26:00  22  D-1.  If you were to take Verizon's suggestion of, okay,

02:26:03  23  well, we can map D-2 and D-3, you would have a claim

02:26:06  24  language with this equation or that equation or that

02:26:09  25  equation which would become more unwieldy.

02:26:12  1          One -- one argument that Verizon makes that this

02:26:17  2  is required or this is necessary because the claim language

02:26:19  3  in the specification make clear that Cn is generated

02:26:23  4  according to a client signal clock and a system clock.

02:26:28  5          And Slide 52, the claim language already recites

02:26:31  6  that.  It recites that generating a client signal byte

02:26:34  7  number Cn according to a client signal clock and system

02:26:38  8  clock.

02:26:39  9          So when you look at the claim term in -- in the

02:26:40  10  context of the entire claim element and the claim language,

02:26:45  11  it's consistent with the specification and the standard.

02:26:47  12  So this makes -- in addition to the other issues

02:26:50  13  identified, this makes Verizon's proposal superfluous.

02:26:53  14          So in sum, we don't think that there's a need to

02:26:57  15  limit this claim term to one conclusion from one reading of

02:27:02  16  the standard, particularly when the standard has a variety

02:27:04  17  of different event equations or expressions to describe Cn.

02:27:10  18  It has narrative non-leading descriptions of Cn.  And so

02:27:14  19  for those reasons, we submit Verizon's proposal should be

02:27:17  20  rejected.

02:27:18  21          One quick point on Huawei's proposal.  We tried to

02:27:21  22  propose something that was we thought a reasonable

02:27:24  23  reflection of the plain meaning of the term.  The one piece

02:27:27  24  there that you see where we tried to add a clarifying

02:27:32  25  modifier would be in the OTN frame.  It would be -- I'm not

02:27:35   1   trying to say anything or mischaracterize anything, but I

02:27:39   2   don't think that part of it is disputed as a technical

02:27:41   3   matter.  If the Court is not inclined to -- to construe it

02:27:45   4   and just leave it as the plain language, we would be fine

02:27:46   5   with that, as well.

02:27:47   6          Thank you, Your Honor.

02:27:47   7          THE COURT:  All right.  Let me hear from Verizon

02:27:50   8   in response.

02:27:54   9          MR. VERHOEVEN:  Good afternoon, Your Honor.

02:27:58   10  Charles Verhoeven.  And can you hear me okay?

02:27:59   11         THE COURT:  I can hear you fine, counsel.  Go

02:28:03   12  ahead.

02:28:03   13         MR. VERHOEVEN:  Okay.  Your Honor, if we could

02:28:06   14  turn to the slide deck for the '236 patent that we

02:28:10   15  submitted, I believe, last night or yesterday.

02:28:12   16         THE COURT:  I have that.

02:28:13   17         MR. VERHOEVEN:  I don't know if you have that,

02:28:15   18  Your Honor.

02:28:15   19         THE COURT:  I do.

02:28:16   20         MR. VERHOEVEN:  And in particular, I'd like to

02:28:19   21  direct Your Honor's attention to Slide No. 9.

02:28:27   22         So on this slide, the issue here -- before I get

02:28:33   23  into the slide, the issue is whether or not Cn has some

02:28:36   24  meaning that's outside of its use here in the standard.

02:28:41   25  And I think it's undisputed, the answer to that is no.

02:28:45  1   It's a coined term that is defined in the standard.

02:28:49  2        And so the question is, you know, do you -- do you

02:28:55  3   accept the definition in its entirety, or do you just

02:28:59  4   ignore the calculation and refer to the name of Cn -- given

02:29:04  5   to Cn as part of the formula for the calculation, which we

02:29:08  6   would submit is not appropriate.

02:29:10  7        But let me start by -- with the intrinsic record,

02:29:14  8   Your Honor.

02:29:14  9        And if you look at Column 5, Line 17 through 29,

02:29:19 10   the patent states:  In the embodiments of the present

02:29:22 11   disclosure, according to the CBR mapping method described

02:29:27 12   in International Telecommunications

02:29:31 13   Union-Telecommunications Standardization Sector, ITU-T,

02:29:36 14   Recommendation 6709 Living List SP13, comma, new Cbyte

02:29:45 15   generating and explaining rules of operation -- operation

02:29:49 16   method, therefore, are defined.

02:29:51 17        So the specification is telling a person of

02:29:56 18   ordinary skill in the art that what we're -- what we mean

02:30:00 19   by these -- by Cbyte generating the rules and the operation

02:30:05 20   method is those contained in this Living List SP13, Your

02:30:10 21   Honor.

02:30:10 22        And the Living List, as counsel pointed out, was

02:30:17 23   sort of an interim standards document, but it's a specific

02:30:23 24   document that we have that we can look at.  And it was what

02:30:28 25   existed at the time and what they chose to refer to to

02:30:31  1  define Cn.

02:30:34  2          Next slide.

02:30:36  3          Now, Slide 10, Your Honor, I think it's important

02:30:42  4  to note that we're not talk -- the claims are not merely

02:30:44  5  referring to Cn as a value like in passing.  Instead, the

02:30:57  6  claim itself requires, quote, generating a client signal

02:31:04  7  byte number Cn.  So it's not just referring to Cn, that

02:31:08  8  this element requires that Cn be generated.

02:31:15  9          And the Living List below on the left, Your Honor,

02:31:19  10 provides a formula for the generation of Cn.

02:31:23  11         Now, I'd like to take the top -- the top box

02:31:28  12 there -- the top algorithm.  And, basically what this is

02:31:34  13 saying, Your Honor, is this is -- it explains exactly how

02:31:38  14 to calculate Cn.  And I'm not going to go into the math,

02:31:41  15 but it's basically using the speed of the client signal

02:31:45  16 coming in and the speed of the OTN going out, and putting

02:31:51  17 those into a formula to decide whether Cn needs to go up or

02:31:56  18 down.

02:31:57  19         And that is what the patent clearly says it's

02:32:00  20 referring to when we're talking about Cn.  And when we're

02:32:06  21 talking about generating a Cn, you need to look at this

02:32:10  22 formula.

02:32:11  23         Now, there's a formula below it that has different

02:32:14  24 variables, and there's a formula later on that counsel

02:32:18  25 points to, as well.

02:32:20  1          Those are not inconsistent with the first formula,
02:32:23  2  Your Honor.  This is algebra, and they're just rearranging
02:32:28  3  different variables.  But it's the same calculation of Cn
02:32:31  4  across all these algorithms.  And that's why we said in our
02:32:34  5  reply, Your Honor, that we can include all of them because
02:32:38  6  they're all -- they're all being the same -- they all
02:32:41  7  calculate Cn the same way.
02:32:42  8          But what -- what I would say, Your Honor, is
02:32:49  9  that -- that counsel's proposed construction is -- is
02:32:53 10  unacceptable because it's like being half pregnant.
02:32:58 11          And so what they've done is they've pointed down
02:33:01 12  to this formula to the -- to the bottom where it says
02:33:05 13  wherein Cn is the number of client information entities,
02:33:08 14  n bits, per server frame.
02:33:10 15          But they divorce it from the calculation.  They
02:33:15 16  say:  Oh, yeah, we need to use the standard, Your Honor,
02:33:18 17  and here we're pulling it out of a portion of an assumption
02:33:23 18  that's contained in this formula, but we're not going to
02:33:26 19  include the rest of the formula.
02:33:28 20          And so we've -- we've cut out from the
02:33:32 21  construction how you generate the Cn.  It's no longer
02:33:38 22  generated according to the Living List, which the patent
02:33:42 23  specification itself says is the definition we should look
02:33:46 24  at for these things.
02:33:48 25          Let's see, one more slide, Your Honor.

02:33:59  1          And then when you go to the actual standard, the
02:34:07  2   standard itself says that Cn, quote, is defined by this
02:34:10  3   formula.  And so there's not -- it's not a question of
02:34:14  4   ambiguity.  A person of ordinary skill in the art would
02:34:17  5   pick up the Living List and would look at where Cn is in
02:34:25  6   that Living List, and they'd see the rules for how to
02:34:29  7   generate a Cn, and they'd follow those rules so that they
02:34:32  8   can have a Cn -- generate a Cn.  If they don't follow those
02:34:36  9   rules, they're not generating a Cn because Cn is defined
02:34:40  10  within that calculation.
02:34:40  11         So we would submit that this is a case where the
02:34:45  12  specification incorporates the standards definition for the
02:34:50  13  methodology and calculations used to generate Cn.
02:34:56  14         And that's all I have, Your Honor, unless you have
02:34:58  15  any questions.
02:34:58  16         THE COURT:  What you're really telling me,
02:35:01  17  Mr. Verhoeven, is that you're proposing for the Court to
02:35:03  18  construe Cn but not the rest of this section of the claim
02:35:08  19  language?  You're not asking me to construe client signal
02:35:13  20  byte number, just Cn, correct?
02:35:16  21         MR. VERHOEVEN:  I think so, yes.  Let me just
02:35:19  22  check our -- Cn is fine, just construing Cn.
02:35:32  23         THE COURT:  Well, my reading of your submission is
02:35:35  24  that's what you've limited your request to the Court to be.
02:35:38  25  If you're asking me to do more than that, please tell me.

02:35:41  1            MR. VERHOEVEN:  I am not.

02:35:42  2            THE COURT:  Okay.  Let me see if Huawei has any

02:35:49  3  follow-up.

02:35:50  4            MR. HAMAD:  Yes, Your Honor, a few points.

02:35:52  5            I guess I'd like to actually start on Slide 9 of

02:35:57  6  Mr. Verhoeven's deck where he points to excerpts of the

02:36:02  7  specification.

02:36:03  8            So first, the section on the left is referencing

02:36:09  9  Cbyte, which is understood to be the field where the client

02:36:16  10  signal byte number information goes.  And that is not an

02:36:21  11  indication in the specification that the inventors intended

02:36:24  12  to define or limit the term "client signal byte number Cn"

02:36:29  13  to -- to what is referenced here in the Living List.

02:36:33  14            Then the other point on Slide 10 of

02:36:39  15  Mr. Verhoeven's deck, the equations in the Living List that

02:36:46  16  are referenced there, they're not identical to the equation

02:36:51  17  D-1 that they are now proposing as part of the

02:36:55  18  construction.

02:36:58  19            And one more point that Your Honor hit on, which

02:37:00  20  is that all of the arguments has been about the constituent

02:37:07  21  variable Cn without regard to the larger phrase "client

02:37:11  22  signal byte number Cn."  And that's not just a difference

02:37:17  23  without meaning.

02:37:19  24            When you look at Cn alone, for example, as

02:37:23  25  described in conjunction with equation D-1, that's a

02:37:27    1   reference to number of clients n bit data entities.  And

02:37:32    2   here your -- the claim language is a byte number.

02:37:35    3          So we're looking at slightly different levels of

02:37:39    4   granularity in terms of what -- I guess the size of the

02:37:44    5   number we're looking at.

02:37:45    6          So kind of on balance, we're still back to a place

02:37:51    7   where Cn would be consistent with the standard, but there's

02:37:54    8   not any indication or any reason to limit it to one

02:37:57    9   particular calculation.  It's not just equation D-2 and

02:38:01   10   D-6, I guess, that -- that would fix it.  D-7 is another

02:38:07   11   integer function of -- that -- for Cn, when you have, you

02:38:10   12   know, equations in Section D.2 on the GMP in OTN.  So on

02:38:16   13   balance, we don't think that it can be limited to just that

02:38:18   14   one equation.

02:38:20   15          THE COURT:  All right.  Anything further from

02:38:24   16   Verizon, Mr. Verhoeven, on this term?

02:38:26   17          MR. VERHOEVEN:  Just one -- one thing.  I

02:38:30   18   apologize if I've already said it, but they have pointed to

02:38:36   19   the Living List.  Their proposal for Cn is taken straight

02:38:42   20   from the Living List, quote, number of client information

02:38:46   21   entities, n bits, per serverframe.  And, you know,

02:38:49   22   that's -- that's taking what they want but not what they

02:38:52   23   don't want from the standard.  And you're either defined by

02:38:56   24   the standard or you're not defined by the standard.

02:38:59   25          And so we would submit that their proposed

02:39:03  1  construction shows that they admit that this is where a

02:39:06  2  person of ordinary skill would go to find the meaning

02:39:09  3  because it's taken verbatim, and right above that is the

02:39:13  4  algorithm.  And there's no reason that a person of ordinary

02:39:18  5  skill would use a part of that algorithm as definitional

02:39:22  6  and not the rest of it.

02:39:23  7          That's all I have, Your Honor.

02:39:24  8          THE COURT:  All right.  Thank you, counsel.

02:39:27  9          Let's go to our next set of disputed claim

02:39:34  10  language, this also from the '236 patent.  And we'll take

02:39:40  11  up if the Cn transported in the OTN frame needs to be

02:39:45  12  increased or decreased and the Cn transported in the OTN

02:39:52  13  frame doesn't need to be increased or decreased.

02:39:55  14          Looks like Verizon's argument here is that this is

02:40:00  15  indefinite, and I'd like to hear that argument first.  Then

02:40:05  16  I'll hear from Huawei.

02:40:07  17          Mr. Verhoeven?

02:40:08  18          MR. VERHOEVEN:  Thank you, Your Honor.

02:40:08  19          So this is just improper -- if it -- well, let me

02:40:16  20  back up.

02:40:17  21          This is an "if/then" phrase.  And the "if" part of

02:40:21  22  the "if/then" phrase, Your Honor, is not defined or

02:40:24  23  disclosed in the specification, and that's the problem.

02:40:30  24          So we don't know whether the "then" comes.  And if

02:40:35  25  the "if" part of the phrase is in the claim language, it's

02:40:39  1   claimed in this particular -- in these particular frames,

02:40:43  2   and so you need to be able to determine what -- what are

02:40:45  3   the circumstances surrounding when the Cn transported in

02:40:50  4   the OTN frame needs to be increased and what are the

02:40:53  5   circumstances where it needs to be decreased, otherwise,

02:40:57  6   you don't know if the "then" comes.

02:41:04  7         So just a simple -- just one second, Your Honor --

02:41:08  8         THE COURT:  I don't see a "then" in the claim

02:41:11  9   language, counsel.  I guess that's your point.

02:41:12  10        MR. VERHOEVEN:  It doesn't say -- you're right,

02:41:14  11   Your Honor.  And I apologize for not saying that.  But it

02:41:17  12   is an "if/then" logic.

02:41:18  13        So it says if the -- I'm on Slide 17, Your Honor,

02:41:22  14   of our presentation.

02:41:27  15        For example, it says:  If the Cn transported in

02:41:31  16   the OTN frame needs to be increased -- and then it has the

02:41:34  17   reversing language.  So if it doesn't need to be increased,

02:41:38  18   you don't do the reversing.  In fact, there's another

02:41:42  19   element I don't have on the slide, Your Honor, but it's the

02:41:44  20   next element, which says if it needs to be decreased, then

02:41:48  21   you do something different.

02:41:49  22        And so in order to -- for a person to know whether

02:41:56  23   or not they're practicing this claim, they need to know in

02:42:00  24   what circumstances would the Cn as claimed here need to be

02:42:04  25   increased and in what circumstances does it need to be

02:42:07  1  decreased?  Otherwise, they don't know whether they're

02:42:12  2  infringing the claim if they reverse the values of the

02:42:15  3  first series or they reverse the values of the second --

02:42:18  4  second series -- series of positions in the area.

02:42:21  5          And so this is -- in my opinion, it's a drafting

02:42:26  6  issue.  There's other claims that don't have this language

02:42:29  7  that they can use, Your Honor.  But in this -- on these

02:42:34  8  particular set of claims, they have included in the claim

02:42:37  9  something that's outside the scope of what's in their

02:42:41  10 specification.  And there's no description in the

02:42:43  11 specification that I could find, Your Honor, that indicates

02:42:46  12 what situations this would -- in what situations this would

02:42:50  13 happen in order to provide metes and bounds here.

02:42:56  14         THE COURT:  Let me -- let me ask you this,

02:42:59  15 counsel.  It -- it seems to me from the briefing and from

02:43:02  16 what I'm hearing that what you're in effect telling the

02:43:05  17 Court is that "needs to" is a subjective term that isn't

02:43:12  18 clearly understood and is a matter of some subjective

02:43:15  19 judgment that's otherwise undefined.

02:43:23  20         And I would -- I would ask you as a counter to

02:43:29  21 that, assuming that's your initial position, certainly if

02:43:36  22 "needs" is in isolation, it has a subjective connotation,

02:43:41  23 but you can need to do something to achieve a specific

02:43:46  24 result.  To achieve this result, you need to move this to

02:43:50  25 another position.  To achieve this, you need to do that.

02:43:53  1          In -- in a situation where the "needs to" action

02:43:59  2  is tethered to an intended result, it's really not

02:44:05  3  subjective, is it?  And is that the case here?  Or is the

02:44:08  4  judgment of what needs or doesn't need to be done

02:44:11  5  untethered to an intended result, and, therefore, perhaps

02:44:16  6  subjective and indefinite?  What's -- what's your response?

02:44:22  7          MR. VERHOEVEN:  Well, my view is -- is this --

02:44:26  8  this is partly how you draft claims.  And they have other

02:44:29  9  claims where they just say reversing, and they have

02:44:34 10  other -- that have these two elements that don't have this

02:44:35 11  language, Your Honor.  And this language is part of the

02:44:38 12  claim and --

02:44:42 13          THE COURT:  The fact -- the fact that they

02:44:43 14  don't -- the fact that they don't use the word "needs" in

02:44:44 15  another claim is really not persuasive here.  I think the

02:44:47 16  Court's got to look at this claim language on its own and

02:44:53 17  not whether it's different from or similar to the way other

02:44:57 18  claim language is presented.

02:44:58 19          I'm really trying to focus on this particular

02:45:01 20  claim language, not some kind of comparison to other claim

02:45:05 21  language.

02:45:05 22          MR. VERHOEVEN:  Thank you, Your Honor.

02:45:06 23          And I'll just say in response that it could be

02:45:12 24  subjective, it could be -- yeah, I guess you'd call it

02:45:17 25  subjective.  You know, someone could set up a system that

02:45:21  1   defines when it needs to be increased or decreased.  And

02:45:24  2   that might be mechanical and not discretionary, but it's

02:45:29  3   discretionary to the person to set up that system.  So in

02:45:33  4   that sense, it's -- I agree, it's subjective.

02:45:35  5          But the -- the point I'm trying to make, Your

02:45:39  6   Honor, is we don't know whether or not this element is met,

02:45:47  7   and there's two options in the claim, and -- and they

02:45:53  8   depend on -- which option you choose depends on whether

02:45:58  9   these could be increased or decreased.

02:46:02  10         And so in order to know whether you're infringing

02:46:05  11  as a matter of logic, you need to know whether these are

02:46:08  12  triggered as stated in the claim.  And because it just says

02:46:11  13  needs to be and doesn't provide further guidance, Your

02:46:15  14  Honor, this is why we're alleging that it's indefinite.

02:46:18  15         THE COURT:  All right.  Let me hear a response

02:46:19  16  from Huawei, please.

02:46:20  17         MR. HAMAD:  Thank you, Your Honor.

02:46:27  18         I'm on Slide 54 of the Huawei claim construction

02:46:30  19  deck.  And I do want to touch on the -- the counterpoint

02:46:36  20  that Your -- that Your Honor made, which is read in -- read

02:46:40  21  in the context of the claim language, it does not need to

02:46:44  22  be subjective or it does not need to be read to be

02:46:47  23  subjective.

02:46:48  24         And, also, one thing I want to point out about the

02:46:51  25  claim language is that the language itself doesn't actually

02:46:53  1   require you to make the determination of whether Cn needs

02:46:56  2   to be increased or decreased.  It just says:  If this

02:46:58  3   determination has been made, do this thing.

02:47:01  4          But in any event, the specification does have

02:47:05  5   adequate disclosure of the conditions in which Cn would

02:47:09  6   need to be increased or decreased.

02:47:11  7          I'm on Slide 55 of our deck.  And what we're

02:47:16  8   looking at here on the left is Figure 7.  And what I've

02:47:21  9   highlighted is this buffer unit 72 sending out this

02:47:24  10  threshold -- threshold indication signal.

02:47:27  11         The specification has description about this and

02:47:32  12  the conditions in a couple different places, but I'm going

02:47:34  13  to go to Slide 56 and back out of the specification just to

02:47:38  14  kind of conceptually walk through how this works.

02:47:41  15         So the buffer unit has -- and what we show in red

02:47:47  16  is this lower threshold, and then in green, we show an

02:47:49  17  upper threshold.  The client data is written into the

02:47:52  18  buffer unit at the client signal clock writing rate.  This

02:47:54  19  fills the buffer unit with client data.

02:48:00  20         What you also have -- what you also have happening

02:48:02  21  is that the client data is read out of the buffer unit at

02:48:05  22  the system clock reading rate.  So it empties the buffer of

02:48:08  23  client data which is placed in the payload area to be sent

02:48:13  24  out on the OTN.

02:48:20  25         On -- on Slide 57, Figure 7, and so what happens

02:48:22  1  is when you hit the upper threshold, the buffer unit sends

02:48:25  2  the threshold indication signal to -- to the Cn value

02:48:28  3  generating unit 74, and it says:  We need to increase Cn.

02:48:34  4  If it hits the lower threshold, it says:  We need to

02:48:38  5  decrease Cn.

02:48:39  6          And the excerpt on the right starting on the line

02:48:43  7  "if the monitoring module 106," what that does is it

02:48:48  8  describes these threshold indication signals that are

02:48:50  9  coming from the buffer unit in relation to the reversing of

02:48:55  10  the values of the bit positions, which is the remainder of

02:48:59  11  the claim language that has these elements at issue.

02:49:01  12          Slide 58 shows just another description of -- of

02:49:08  13  these conditions in relation to Figure 8 which the patent

02:49:11  14  describes as a state machine.  Highlighted are the

02:49:13  15  increasing state and the decreasing state.

02:49:17  16          And then finally -- finally on Slide 59, the --

02:49:21  17  the challenged claim terms' indefiniteness analysis have to

02:49:27  18  be considered in -- obviously in light of specification as

02:49:29  19  a whole.  And so if you were to read the claim language,

02:49:35  20  the specification's disclosure, a person of ordinary skill

02:49:39  21  in the art would reasonably be informed by the scope of the

02:49:42  22  claims.  And Verizon hasn't met a clear and convincing

02:49:45  23  burden to show otherwise.

02:49:46  24          THE COURT:  All right.  Anything further from

02:49:48  25  Verizon, Mr. Verhoeven, on this?

02:49:51  1          MR. VERHOEVEN:  Yes, very briefly, Your Honor.

02:49:53  2          The section of the specification that counsel

02:50:01  3  is -- showed on Slide 57, first, as a matter of process,

02:50:05  4  this was not cited in the joint claim construction

02:50:08  5  statement as evidence that would be relied on.

02:50:11  6          So as a matter of the Court's rules and

02:50:14  7  procedures, this should not be appropriate evidence for

02:50:17  8  them to be citing at this point in the case.

02:50:24  9          Second -- second point, Your Honor, is this is --

02:50:26 10  this is an example from the specification, and it expressly

02:50:31 11  says so.  It doesn't provide the metes and bounds for when

02:50:36 12  you should increase or when you should decrease, Your

02:50:40 13  Honor.  It -- it's just an example.

02:50:45 14          And you can see that as reflected -- pardon me --

02:50:48 15  you can see that as reflected in the proposed claim

02:50:51 16  construction for Huawei.  They don't propose any of

02:50:56 17  these -- they don't propose anything from this example but

02:51:00 18  just a general -- a general term.

02:51:04 19          And finally they're pointing to this FIFO buffer

02:51:08 20  unit as the, I guess, structure for what they're talking

02:51:14 21  about.

02:51:15 22          Now, I know Your Honor said you don't like to

02:51:17 23  compare claims.  I'll be very, very brief.  But there's an

02:51:22 24  apparatus claim in this patent that mirrors this method

02:51:24 25  claim.  And in the apparatus claim, they point -- the --

02:51:29  1   there's a -- there's provisions -- and I don't have it on a
02:51:33  2   slide, Your Honor, I apologize.  But there's provisions
02:51:35  3   just like there is in -- in the claim at issue where you
02:51:40  4   increase -- or you reverse one set for increasing and you
02:51:46  5   reverse another set for decreasing.  And that the
02:51:48  6   associated portion of the spec that was pointed to that
02:51:55  7   associates with that functionality was not identified as
02:52:02  8   this FIFO buffer unit that's identified in 57.  It was --
02:52:06  9   they identified a completely different structure, Your
02:52:09  10  Honor.
02:52:09  11          So just the fact that in their joint claim
02:52:15  12  construction statement they're pointing to one thing, and
02:52:18  13  now in -- and now in their briefing, they're pointing to
02:52:20  14  another thing, I think highlights that we need -- that we
02:52:27  15  don't have guidance here.  And whether these should be
02:52:31  16  increased or decreased is -- are questions that can't be
02:52:34  17  answered based on the intrinsic evidence.
02:52:38  18          Thank you, Your Honor.
02:52:39  19          THE COURT:  All right.  Well, let me say this just
02:52:41  20  for clarification.  It's not that the Court doesn't like to
02:52:44  21  hear how other claim language is structured in an argument
02:52:48  22  as to how specific language then before the Court should be
02:52:49  23  structured.  I just don't think it's always determinative.
02:52:52  24          You know, I can say one thing in one context and
02:52:56  25  say the same thing in another context, and the way that I

02:53:02   1   said it the first time shouldn't constrain the way I say it

02:53:05   2   the second time as long as I'm saying the same thing in two

02:53:09   3   different ways.

02:53:10   4           So it -- it's informative to some extent.  I just

02:53:15   5   don't think it's an overly compelling argument.  But it

02:53:18   6   doesn't have anything to do with whether I like or don't

02:53:20   7   like to do it.  That was my only observation.

02:53:23   8           All right.  This -- this will complete argument on

02:53:26   9   this claim term.

02:53:28   10          And, counsel, we're going to move on to the '505

02:53:32   11  patent, but before we do that, we're going to take a

02:53:36   12  10-minute recess.

02:53:37   13          I've got 2:53 Central Time on the clock on the

02:53:41   14  bench.  So at 3:03, we're going to reconvene.  If you will

02:53:49   15  watch your clocks accordingly.  And I would suggest you

02:53:53   16  simply mute your devices but stay connected, and in 10

02:53:57   17  minutes, I'll be back, and we'll continue, as I say, with

02:54:00   18  the '505 patent.

02:54:03   19          The Court stands in recess.

03:05:12   20          (Recess.)

03:05:13   21          THE COURT:  All right.  Counsel, we'll reconvene

03:05:16   22  the claim construction hearing in the Huawei versus Verizon

03:05:19   23  matter.  It's been recessed the past few minutes.

03:05:23   24          And we'll turn next to the '505 patent, and I'll

03:05:31   25  hear argument first on "optical channel data tributary unit

03:05:38  1  frame" and "ODTU frame" from Claims 1 through 4 of the

03:05:50  2  '505.

03:05:50  3          Let me hear from Huawei on this first, please.

03:05:55  4          MR. HAMAD:  Thank you, Your Honor.  Hamad Hamad

03:05:59  5  for Huawei.

03:06:02  6          Your Honor, would the Court allow me to clarify

03:06:04  7  one thing on the record with respect to the last -- the

03:06:07  8  last term for the '236?

03:06:10  9          THE COURT:  I don't have a problem with that,

03:06:12  10 Mr. Hamad, but for one -- some reason, I'm not seeing you.

03:06:15  11 Are you signed in fully?  I hear you.  I don't see you.

03:06:20  12          MR. HAMAD:  Yes, Your Honor.  Let me try this.

03:06:30  13          THE COURT:  There you are.  What's your

03:06:33  14 clarification?

03:06:33  15          MR. HAMAD:  With -- with respect to the passage of

03:06:34  16 the specification cited on our Slide 57, I had a docket

03:06:37  17 citation for Your Honor to our JCCS where the relevant part

03:06:43  18 of that specification is -- is cited in our JCCS.  And that

03:06:47  19 is Docket No. 59-2, the file stamp Page 19.

03:06:54  20          And the -- the column line numbers that are cited

03:06:58  21 there are 15:56 to 16:9.

03:07:05  22          And the part that is in Slide 57 starts at 15:48,

03:07:10  23 basically where I started reading:  If the monitoring

03:07:13  24 module 106.  That comports entirely with what was cited in

03:07:18  25 our JCCS.

03:07:18  1         And that was it, Your Honor.

03:07:19  2         THE COURT:  Well, let's go to the disputed claim

03:07:24  3  language from the '505.  Let me hear from you first,

03:07:27  4  please, on behalf of Huawei.

03:07:28  5         MR. HAMAD:  Thank you, Your Honor.

03:07:30  6         I'm on Slide 70.  And with respect to this term,

03:07:37  7  the ODTU frame, Verizon's proposal wants to define it with

03:07:44  8  respect to the 2009 version of the G.709 standard.  The

03:07:44  9  dispute between the parties is whether the claim

03:07:51  10  encompasses one of the two structures that are discussed in

03:07:53  11  that standard.  The standard refers to two types of

03:07:57  12  structures, ODTUjk and ODTUk.ts.

03:08:04  13         Huawei's position is that while no construction is

03:08:07  14  necessary, we would like a clarification that the claim

03:08:10  15  would not encompass the "jk" structure.

03:08:15  16         I'm now on Slide 71, which shows this claim

03:08:21  17  element kind of in context with other pieces of Claim 1.

03:08:26  18         The claim recites mapping information of the

03:08:29  19  quantity of n-bit data units of the client signal to an

03:08:37  20  overhead of a first Optical Channel Data Tributary Unit

03:08:38  21  (ODTU) frame.

03:08:38  22         The issue is that the ODTUjk structure has an

03:08:42  23  overhead that does not have a Cbyte or a Cn byte field that

03:08:47  24  gives you the space to put that information.  An analogy

03:08:50  25  would be having a claim that recites a box, and there are

03:08:53  1   two types of boxes.  One has -- you can open it, it has

03:08:58  2   space inside.  And the other is like a solid box.

03:09:00  3        And the claim also recites fill the box with

03:09:03  4   water, and then you would have one party insisting that you

03:09:05  5   could fill the solid box with water.

03:09:07  6        And referencing the spec -- the standard on Slide

03:09:13  7   72, you can see discussion with respect to the ODTUjk

03:09:22  8   overhead.  It describes JC, N -- NJO, and PJO overhead

03:09:27  9   types, but it does not describe Cn or Cm information.  That

03:09:27  10  would go in a Cbyte field or a Cn byte field.

03:09:34  11       In contrast, the ODTUk.ts structure in this

03:09:39  12  particular excerpt, it references the GMP Cm, as in micro,

03:09:43  13  information.  There are other disclosures for the GMP Cn,

03:09:43  14  as in Nancy, parameter.

03:09:51  15       And Huawei submitted expert testimony on this

03:09:52  16  point, and this is on Slide -- depicted on Slide 73.  And

03:10:00  17  this expert testimony from Dr. Bortz on this particular

03:10:03  18  point has gone unrebutted.  Verizon's expert has submitted,

03:10:08  19  to be sure, other testimony on this claim term but not on

03:10:11  20  this point.

03:10:12  21       So with respect to the question of would it be --

03:10:16  22  I guess the question of -- resolving the factual question

03:10:16  23  of what structure a POSITA would have understood to be

03:10:21  24  encompassed by the claim term --

03:10:21  25       THE COURT:  Slow down -- slow down, counsel.

03:10:24  1            MR. HAMAD:  Yes, Your Honor.  Thank you.

03:10:25  2            Let me try that one again.

03:10:29  3            So with respect to the evidence in the record on

03:10:33  4  resolving the factual question of what structures a POSITA

03:10:37  5  would have understood to be encompassed by the claim term,

03:10:40  6  there -- there is nothing else on this particular point.

03:10:44  7            So we would submit that the Court reject Verizon's

03:10:48  8  proposal.  If the Court's not inclined to expressly

03:10:51  9  construe the term as -- as not including the ODTUjk

03:10:56  10  structure, we would be fine with no construction being

03:11:00  11  necessary, given the understanding that the other claim

03:11:03  12  elements would govern whether the ODTUjk structure would be

03:11:08  13  able to -- to meet or practice the claim.

03:11:11  14            Thank you, Your Honor.

03:11:13  15            THE COURT:  Let me ask you this, Mr. Hamad.

03:11:16  16            MR. HAMAD:  Yes, Your Honor.

03:11:18  17            THE COURT:  Cutting through all the slides and all

03:11:21  18  the argument and all the clutter, it seems like to me what

03:11:25  19  Huawei is asking the Court do -- to do here is to adopt a

03:11:30  20  negative construction to foreclose a -- an invalidity

03:11:35  21  defense.

03:11:37  22            Tell me if that's really at the end of the day

03:11:40  23  what you're asking me to do and why should I do it.

03:11:42  24            MR. HAMAD:  Yes, Your Honor, we are asking for a

03:11:45  25  negative limitation.  And the reason it should be done is

03:11:49  1  that as a technological matter, that structure would be

03:11:52  2  incompatible with the remaining claim elements.

03:11:54  3          THE COURT:  I mean, whether the ODTUjk can or

03:11:58  4  can't accommodate Cn bytes, isn't that really a factual

03:12:03  5  issue for the jury and not a claim construction issue for

03:12:05  6  the Court at this juncture?

03:12:06  7          MR. HAMAD:  It could be -- it could be submitted

03:12:12  8  to the jury, Your Honor, yes.  And that's -- that was my

03:12:15  9  conclusion.  If the Court is not inclined to -- to construe

03:12:19 10  it, we're fine with no construction of this term.

03:12:21 11          We -- I guess we -- we're foreseeing this -- this

03:12:28 12  becoming an issue as early as expert reports.  And if

03:12:32 13  there's going to be, you know, prior art that is said to --

03:12:34 14  to read on this, we anticipate the parties are going to

03:12:38 15  dispute this particular issue, whether the -- the JK

03:12:41 16  structure can receive that information when it does not

03:12:44 17  have this field.

03:12:46 18          It -- if there's the understanding that those

03:12:48 19  other elements would govern this with respect to meeting

03:12:51 20  that claim as a whole, then -- then I agree with Your Honor

03:12:54 21  and -- and would submit that no construction is necessary,

03:12:57 22  in that -- in that event.

03:12:59 23          THE COURT:  It seems like to me that Huawei wants

03:13:01 24  the Court to find that ODTU does not encompass ODTUjk to

03:13:10 25  foreclose this invalidity challenge, and Verizon wants me

03:13:14  1  to affirmatively find that ODTU does encompass ODTUjk to

03:13:23  2  support their invalidity challenge.

03:13:26  3         And I guess my question to both of you, and I'll

03:13:29  4  ask Mr. Verhoeven to weigh in on this when he argues for

03:13:33  5  Verizon, why should the Court take either side of this

03:13:36  6  issue at this juncture in claim construction?

03:13:43  7         Let me hear -- let me hear from Mr. Verhoeven on

03:13:45  8  behalf of Verizon, please.

03:13:47  9         MR. VERHOEVEN:  Thank you, Your Honor.

03:13:47  10        This is another term where both sides -- well,

03:13:54  11  before I start, Your Honor, if Your Honor could direct your

03:13:58  12  attention to the '505 slides for Verizon, and we'll start

03:14:04  13  on Slide 5.

03:14:09  14        So on this slide, I put up the declarations from

03:14:13  15  both the expert -- claim construction experts from both

03:14:15  16  sides, and they both state that it's Section 19.2 and

03:14:25  17  that's where this term comes from, Section 19.2 of the

03:14:28  18  standard.

03:14:28  19        Our construction is -- proposed construction is

03:14:31  20  simply to say it's defined in the standard in Section 19 --

03:14:35  21  19.2.  We're not excluding something or adding something.

03:14:42  22  We're just referring to where the standard says OT -- ODTU

03:14:47  23  definition, Your Honor.  And that a person of ordinary

03:14:50  24  skill in the art would look to that to ascertain whether

03:14:55  25  it's ODTU within the standard.

03:14:57  1          And because this has meaning only in the standard,

03:15:03  2  it's -- it's not like a term that you can take out -- out

03:15:08  3  of context.

03:15:09  4          So that's our position.  And if you look at this

03:15:15  5  slide, this is a slide in the current G.709 standard, Your

03:15:20  6  Honor, and provides two different types of ODTUjk and ts.

03:15:25  7          Here we have a situation where not only is Huawei

03:15:33  8  arguing that a future ODTUk -- future definition, which is

03:15:41  9  ODTUk.ts -- not only that should be encompassed in the

03:15:47  10  definition, which didn't exist at the time of the patent,

03:15:51  11  only the jk definition existed.  And that's just not --

03:15:57  12  and -- and on top of that, to exclude the ODTUjk which was

03:16:03  13  disclosed at the time of the filing, and that would be

03:16:08  14  inappropriate, Your Honor.

03:16:10  15          If you look at the '505 patent -- now I'm on Slide

03:16:14  16  6 -- citing to Column 1, Lines 53 through 63, it talks

03:16:22  17  about the G.709 recommendation defines an Optical Channel

03:16:29  18  Payload Unit-k tributary slot and an Optical Channel

03:16:35  19  Tributary Unit j into k.

03:16:38  20          And so the patent itself refers to ODTU j to k

03:16:44  21  as -- as an OPUk.ts -- oh, I'm sorry, as an ODTU.

03:16:54  22          And so they're arguing that the thing they even

03:16:56  23  cite for themselves in the specification as an example

03:16:59  24  should be excluded.  We don't think that's appropriate,

03:17:02  25  Your Honor.

03:17:02   1            This next slide, Slide 7, is simply a timeline so

03:17:08   2   Your Honor can see.

03:17:09   3            In 2003, there -- there was the 2003 standard,

03:17:14   4   Your Honor.  And back then, the definition of ODTU was just

03:17:18   5   ODTUjk.  That's it.  So that was the standard that existed

03:17:24   6   in April of 2007 when the patent was filed, only ODTUjk.

03:17:33   7            And the standard -- the new standard which

03:17:37   8   included both jk and k.ts didn't even come out until 2009,

03:17:46   9   a couple years after the patent was filed.  And so we think

03:17:51  10   it would be inappropriate to construe ODTU in the abstract.

03:17:55  11   It's a defined term.  It's -- it's -- the patent itself

03:17:59  12   references the standard.  The standard existed at the time,

03:18:02  13   including ODTUjk, so we shouldn't exclude that.

03:18:07  14            But there -- there needs to be some -- some

03:18:09  15   construction, and the construction we submitted should

03:18:13  16   refer to the section in the standard which provides the

03:18:15  17   definition.

03:18:15  18            THE COURT:  All right.  Mr. Hamad, do you have

03:18:22  19   anything in a slower speed to offer?

03:18:24  20            MR. HAMAD:  Yes, Your Honor.

03:18:33  21            So referring to the Column 1 specification cite,

03:18:36  22   so that's describing -- that's the patent, the '505 patent,

03:18:41  23   describing the then existing ODTU structure.

03:18:44  24            But the patent is describing improvements to that

03:18:47  25   structure that would encompass the ODTUk.ts.  And I don't

03:18:51  1  think the parties dispute that it would encompass that.

03:18:54  2         And so on the ODTUjk, our point is simply that

03:18:58  3  there is other claim language that is not being read in

03:19:01  4  conjunction with this particular term when you're looking

03:19:05  5  at Verizon's proposal that makes it to where it didn't make

03:19:08  6  sense.

03:19:09  7         But, again, like I mentioned, we're -- we're okay

03:19:11  8  taking this up as a factual matter with experts and the

03:19:16  9  jury and -- and just not having it construed.

03:19:19  10        THE COURT:  All right.  I think I understand your

03:19:21  11  position.

03:19:26  12        Excuse me.

03:19:26  13        All right.  Let's go next to "n-bit data units"

03:19:42  14  and "n indicating the number of the multiple OPUk TSs,"

03:19:48  15  again, from the '505 patent.

03:19:50  16        And let me hear from Verizon first on this,

03:19:54  17  please.

03:19:54  18        MR. VERHOEVEN:  Thank you, Your Honor.

03:19:55  19        This is a situation where the claim uses "n" as a

03:19:59  20  part of the formula in the actual claim.  And we're simply

03:20:04  21  asking the Court to confirm that "n" means the same thing

03:20:08  22  throughout the -- throughout the individual claim element

03:20:11  23  in them.

03:20:16  24        And apparently, Huawei's position is that not only

03:20:19  25  should you not do that, that there should be a construction

03:20:21  1  that n-bit data unit, "n" means something different than

03:20:28  2  the "n" that's used later in the construction, which

03:20:34  3  there's -- there's just no support for that.

03:20:36  4        Here's a claim -- I'm on Slide 19, Your Honor, of

03:20:41  5  my slides for the '505 patent, and we're showing Claim 2.

03:20:48  6        And you can see that "n" is used in the claim.

03:20:53  7  It's the same "n."  And as a matter of claim construction,

03:20:55  8  Your Honor, terms that are used in the claim have the same

03:21:00  9  meaning.  Same term is used, then the presumption is they

03:21:04  10  have the same meaning.

03:21:06  11        And there's no reason why "n" could not be the

03:21:08  12  same for both -- for all the places indicated here.  The --

03:21:15  13  the technology would work just fine.  And this is claiming,

03:21:20  14  in our view, that -- that the "n" is the same for the bits

03:21:28  15  of data units as it is for the number of TSs, Your Honor.

03:21:33  16        And to interpret it differently would be

03:21:38  17  inconsistent with claim construction rules and unfair to a

03:21:41  18  person of ordinary skill in the art who normally would --

03:21:44  19  would understand that you're talking about some sort of

03:21:47  20  calculation or determination and you use a variable -- a

03:21:52  21  constant letter variable that that -- that refers to the

03:21:56  22  same thing each time in the equation.

03:21:58  23        And this is simply set forth in claim construction

03:22:01  24  language.  It's the same thing.  It uses "n" both for --

03:22:05  25  for the number of bit data units and the same "n" for --

03:22:13  1   when it's talking about the OPUk TSs.

03:22:18  2        And so we're simply asking the Court to confirm

03:22:20  3   that "n" means the same thing throughout.

03:22:23  4        THE COURT:  Let me -- let me ask a question for

03:22:26  5   clarification, Mr. Verhoeven.  And it might be helpful for

03:22:28  6   you to look at Claim 2 of the '505 patent in Column 17.

03:22:36  7        If you look at Claim 2, you see several elements

03:22:43  8   of the claim that begin with mapping information or

03:22:47  9   mapping.  There's mapping --

03:22:49  10       MR. VERHOEVEN:  Right.

03:22:50  11       THE COURT:  -- information, there's mapping the

03:22:53  12  n-bit data, and there's mapping each byte.  And then if you

03:22:56  13  look at the very end of that last element that begins

03:23:02  14  "mapping each byte," you have "n indicating the number of

03:23:07  15  multiple OPUk TSs."

03:23:09  16       MR. VERHOEVEN:  Right.

03:23:09  17       THE COURT:  Are you -- are you asking -- and this

03:23:12  18  is where I need your clarification -- are you asking me to

03:23:14  19  take that last phrase, "n indicating the number of the

03:23:17  20  multiple OPUk TSs," and let that apply within that last

03:23:26  21  element that begins "mapping each byte," or are you

03:23:30  22  suggesting that it should be applied throughout every

03:23:33  23  element of Claim 2, or are you suggesting that it should be

03:23:36  24  applied throughout every claim of the '505 patent where

03:23:41  25  this language is used?

03:23:43  1        Try -- can you clarify the scope of what you're

03:23:45  2  telling me or arguing the application should be?

03:23:48  3        MR. VERHOEVEN:  Your Honor, it's the second of

03:23:51  4  your three listed options.  It's that -- this is a

03:23:56  5  definition provided in the claim itself.  And it's --

03:24:01  6  it's -- the plain meaning of this is it's saying that the

03:24:05  7  number of OPUk TSs is the same as the n-bit data units

03:24:10  8  because they use the same "n."

03:24:12  9        THE COURT:  Well, let -- let me ask this then.  If

03:24:15 10  the last phrase of this last element or the last mapping

03:24:20 11  element, "n indicating the number of the multiple OPUk

03:24:27 12  TSs," if that's to apply throughout Claim 2 and not just to

03:24:31 13  this element within Claim 2, why is it not offset as a

03:24:37 14  separate element?  Why is it embedded into this particular

03:24:42 15  element if it's to be applied outside of that particular

03:24:45 16  element?

03:24:46 17        Doesn't the -- the presentation of it as a phrase

03:24:51 18  at the end of that element and as a part of that element

03:24:55 19  indicate its application should be limited to that element?

03:25:00 20  That's my question.

03:25:02 21        MR. VERHOEVEN:  I understand, Your Honor.  And,

03:25:05 22  obviously, we don't draft the patents -- claims.  The --

03:25:09 23  Huawei's patent counsel did.  But I understand what you're

03:25:13 24  saying, Your Honor.  The claim could be clearer.

03:25:17 25        But, you know, there could be a hard return there

03:25:24  1   instead of a comma to make it even more clearer, Your

03:25:28  2   Honor.  But this is -- this is where the claim says what

03:25:30  3   "n" means, and there's no indication that it's saying it

03:25:33  4   only means it for one of the elements, Your Honor.  It's

03:25:40  5   using it throughout the claim.

03:25:42  6           And I think a person of ordinary skill in the art,

03:25:44  7   if you're doing some sort of calculation and you're using

03:25:49  8   an "n," would assume that the ordinary practice of "n"

03:25:53  9   meaning the same variable would apply.

03:25:56  10          I'm not sure, Your Honor, if you can hear me.

03:25:58  11          THE COURT:  I hear you fine.

03:25:59  12          MR. VERHOEVEN:  Okay.  My screen froze.  That's

03:26:10  13  all.

03:26:10  14          So that -- that -- that's what I would argue, Your

03:26:13  15  Honor.  They -- that might be an argument you could make,

03:26:13  16  but it's not clear from the claim.  And the claim itself

03:26:15  17  says "n indicates a number of multiple OPUk TSs?"  And it's

03:26:20  18  the same "n" throughout the claim.

03:26:22  19          So what do we do if it's not the same "n"?  You

03:26:26  20  know, it's -- they should have called -- if they wanted it

03:26:30  21  to be different, they should have called it a different

03:26:32  22  label than the same "n," because it's -- if they meant

03:26:36  23  something different.  It's incredibly confusing.

03:26:39  24          THE COURT:  All right.  Let me hear Huawei's

03:26:41  25  response, Mr. Hamad.

03:26:42  1              MR. HAMAD:  Thank you, Your Honor.

03:26:47  2         Let me start on Slide 76 of my presentation.  And

03:26:52  3   our position is essentially what -- what Your Honor

03:26:57  4   articulated, which is that the "n" in the n-bit data units

03:27:02  5   and those first three elements shown on the slide, that has

03:27:05  6   one meaning that -- that relates to the n-bit data units.

03:27:10  7         But when you get to that last mapping each byte of

03:27:10  8   the second OTN frame, when you get to that last block

03:27:17  9   element, the "n" in that claim element (beeping) to the

03:27:23 10   number of OPUk TSs, and it could be different.

03:27:27 11         And shown on Slide 77, it is a general, you know,

03:27:32 12   principle that -- that we try to have consistency with

03:27:36 13   respect to claim terms, but it's not a hard and fast rule.

03:27:39 14   And the Federal Circuit has explained in particular that

03:27:41 15   the same claim term can have different constructions

03:27:44 16   depending upon the context of how that term is used within

03:27:46 17   the claims and specification.

03:27:49 18         And in this Aventis case, the term "substantially

03:27:55 19   pure" was construed to have different meanings, depending

03:28:00 20   on whether it was used to refer to an intermediate product

03:28:01 21   or end product.

03:28:03 22         And here we have an analogous scenario where we

03:28:06 23   have different context in both the claims, as -- as Your

03:28:08 24   Honor pointed out with the claim structure, but also with

03:28:12 25   the specification.

03:28:13   1            So on Slide 78, what we're showing is Dr. Bortz's
03:28:17   2    declaration where he identifies examples in the
03:28:21   3    specification of where the same placeholder variable "n" is
03:28:24   4    used to refer to different things.
03:28:26   5            So n-bit to describe the number of bits in a data
03:28:30   6    unit, "n" to describe the number of TSs in an OPUk, and "n"
03:28:34   7    to denote the multi-frame in Figure 6.
03:28:36   8            And the other thing I guess I want to point out is
03:28:41   9    "n" is not a stand-alone claim term even.  It's -- it's
03:28:44  10    used within the claim terms that Verizon identifies,
03:28:48  11    and the -- the construction or the proposal that Verizon
03:28:51  12    has where it's going to be the same across terms doesn't
03:28:55  13    account for the remainder of the claim term or the claim
03:28:58  14    language.
03:28:58  15            And so on Slide 79, this is kind of what happened
03:29:02  16    in this Aventis case.  The Federal Circuit noted that
03:29:05  17    separating the phrase "substantially pure" from the very
03:29:08  18    next word resulted in this artificial -- artificial
03:29:12  19    truncation that was error, and by decoupling the modifier
03:29:16  20    from the rest of the claim term, there ended up being a
03:29:19  21    single interpretation across different terms even though
03:29:22  22    the context suggested or required that there be separate
03:29:26  23    definitions.
03:29:27  24            And so on Slide 80, you just see the two terms
03:29:30  25    side-by-side.  And the only aspect of those terms that is

03:29:34  1  being considered in this proposal is just that placeholder

03:29:38  2  variable.

03:29:39  3          So we -- we don't think that -- that Verizon's

03:29:42  4  proposal fits here, and we would respectfully request that

03:29:47  5  it be rejected.

03:29:49  6          THE COURT:  All right.  Anything further from

03:29:50  7  Verizon, Mr. Verhoeven, on this term?

03:29:54  8          MR. VERHOEVEN:  Yes, just really briefly.

03:29:57  9          On the Aventis cite, this is not -- this is not

03:30:01  10  apposite to our case.  The "n" is a variable.  It's a math

03:30:04  11  term, and it's -- it's -- it's appropriate to have it

03:30:11  12  construed as to what the scope and bounds of that math term

03:30:15  13  is.

03:30:16  14          And any mathematician would tell you that if

03:30:20  15  there's an equation that uses a variable with a specific

03:30:24  16  letter and it uses that same letter in other places in the

03:30:28  17  calculation, that what that means is it's the same

03:30:34  18  variable, Your Honor.  And that is what a person

03:30:38  19  of ordinary -- ordinary skill in the art would understand.

03:30:42  20          And looking at this claim, it -- it's using "n"

03:30:47  21  the same way -- it's using the same variable throughout the

03:30:52  22  claim.  And whether they meant to or not, Your Honor -- and

03:30:55  23  I think they meant to -- the -- the person looking at this

03:31:01  24  is going to think "n" means the same thing, because in

03:31:06  25  math, when you use a letter to talk about a variable and

03:31:10  1  you use the same letter later, that's -- every

03:31:14  2  mathematician will tell you that's indicating the same

03:31:17  3  variable so --

03:31:18  4          THE COURT:  Do you have --

03:31:20  5          MR. VERHOEVEN:  I'm sorry.

03:31:20  6          THE COURT:  Do you have a declaration from a

03:31:22  7  mathematician in support of that?

03:31:24  8          MR. VERHOEVEN:  No, I don't, Your Honor.

03:31:27  9          THE COURT:  Well, we liberal arts majors don't

03:31:32  10  necessarily know what all the mathematicians know.

03:31:36  11          MR. VERHOEVEN:  Guilty as charged.

03:31:38  12          THE COURT:  What else?

03:31:38  13          MR. VERHOEVEN:  I just want to do -- can I do one

03:31:40  14  thing really quick before we move on, Your Honor, is I

03:31:43  15  wanted to show one more slide in my deck if I could, and I

03:31:46  16  think this relates to what we're talking about.

03:31:48  17          THE COURT:  All right.  Which slide?

03:31:50  18          MR. VERHOEVEN:  It's Slide 22 -- 22.

03:31:52  19          So we're talking about -- you know, I guess we're

03:31:55  20  trying to get to what did the inventors want these things

03:31:58  21  to mean, as well as what does a person of ordinary skill

03:32:01  22  think.

03:32:02  23          And if you look at these two claims, the one on

03:32:05  24  the left is the '505, Claim 2, we've been talking about.

03:32:09  25  And the one on the right is the '431 patent which is a

03:32:15   1   continuation of the '505 patent, Your Honor.  And you can

03:32:22   2   see here they -- they chose to use "m," not "n" -- "m" as

03:32:22   3   in man, not "n" as in Nancy, to describe the data units in

03:32:25   4   this particular claim.  And then the Dependent Claim 3 uses

03:32:30   5   a different variable "n" to indicate the quantity of the

03:32:36   6   multiple TSs.

03:32:36   7         So that's a claim where they could do certain

03:32:39   8   things, but that stands in sharp contrast to Claim 2 of the

03:32:43   9   '505 patent where they used "n" throughout.

03:32:45   10        Hat and the continuation demonstrates the

03:32:47   11   inventors knew how to use a different variable when they

03:32:50   12   wanted to by indicating it with a different letter.

03:32:55   13        That's all I have, Your Honor.

03:32:56   14        THE COURT:  All right.  Thank you, counsel.

03:32:58   15        Let's -- let's transition to the '253 patent.  And

03:33:03   16   I'll take up the "judging," "judge," "determining whether"

03:33:12   17   terms from Claims 1, 4, and 6 and 9 and 14 of the '253

03:33:12   18   patent.

03:33:21   19        It looks like in this particular scenario that

03:33:25   20   Huawei says these are so clear that no construction is

03:33:28   21   necessary.  And Verizon says at least alternatively that

03:33:31   22   they're so unclear that they're indefinite.  So I'll look

03:33:35   23   forward to your competing arguments.

03:33:37   24        And let's begin with Verizon's argument.  Let me

03:33:39   25   hear from Verizon on these terms.

03:33:41  1            MR. WATKINS:  Good afternoon, Your Honor.  Brett

03:33:45  2  Watkins for Verizon.  Can you hear me okay?

03:33:48  3            THE COURT:  I can hear you just fine.

03:33:50  4            MR. WATKINS:  Thank you.

03:33:50  5            And may I ask, do you have our slide deck for the

03:33:56  6  '253 patent handy?

03:33:57  7            THE COURT:  I do.  I can't see you, Mr. Watkins,

03:34:01  8  but I can hear you.

03:34:02  9            MR. WATKINS:  Okay.  My -- my camera button says

03:34:05  10  that it is turned on.  So maybe I'll try and turn it off

03:34:09  11  and then back on.  Okay.  Can you hear me now, Your Honor?

03:34:14  12            THE COURT:  I can hear you, and I can sort of see

03:34:17  13  you.  You're kind of fuzzy, but go ahead.

03:34:21  14            MR. WATKINS:  Okay.  That's probably for the best

03:34:23  15  actually.

03:34:24  16            MR. VERHOEVEN:  You're fuzzy.

03:34:28  17            MR. WATKINS:  So I think, Your Honor, to address

03:34:29  18  these terms, and I think you noted that it is a group of

03:34:34  19  terms.  These are limitations that -- that appear in each

03:34:39  20  of the dependent claims of the '253 patent.  They raise the

03:34:42  21  same issue, so we've briefed them, and we'll argue them as

03:34:47  22  a group.

03:34:47  23            And I think it would help to sort of step back and

03:34:49  24  take a look at the '253 patent more generally and then

03:34:53  25  focus on those terms.

03:34:55  1          So if you could turn to Slide 4 from our slide

03:34:59  2   deck.  We have a -- what's here basically is an overview of

03:35:07  3   what -- what the '253 patent is disclosing as the claimed

03:35:11  4   invention.  And I'll paraphrase the -- the part that we've

03:35:17  5   excerpted from the patent, but Figure 5 shows it.  It's

03:35:21  6   basically -- it's a -- it's a ring of ethernet nodes

03:35:24  7   labeled in this Figure A through F.

03:35:28  8          And what happens is when there is a break or a

03:35:33  9   fault in a link between two of the nodes, those two nodes

03:35:36  10  that are adjacent to the link that's failed will send out

03:35:39  11  a -- it's called a false message.

03:35:43  12         In the figure, it says AIS.  That's one embodiment

03:35:48  13  of the fault message that's disclosed in the patent, and so

03:35:50  14  they'll send those to the other nodes in the network to

03:35:52  15  inform them that there's been a failure.

03:35:54  16         So I guess the point that I'd like to get across

03:35:57  17  here is that each of these other nodes, for example, Node

03:36:01  18  A, will receive two different messages.  It will receive

03:36:05  19  one from Node D, and then it will receive another one from

03:36:08  20  Node E that comes all the way around the other side of

03:36:11  21  the -- the ring.

03:36:12  22         And so with that in mind, I'd like to turn to the

03:36:17  23  language of Claim 1 so we can look at the disputed claim

03:36:21  24  language, and that's on Slide 6 of our presentation.

03:36:26  25         You'll see Claim 1, the way it's set up -- it

03:36:30  1  says:  A ring protection method -- and then it says -- and
03:36:33  2  I'm going to paraphrase again, but it says:  Detecting, by
03:36:36  3  a first node, that there's been a link fault, blocking the
03:36:42  4  port connected to that link fault, and then sending a fault
03:36:47  5  alarm message to other nodes, and where that fault alarm
03:36:51  6  message includes an identifier that indicates the node that
03:36:51  7  detected the fault.
03:36:54  8        And the other nodes, when they receive the
03:36:57  9  message, will judge whether that identifier has -- is
03:37:00 10  different from one -- a fault identifier record.  And then
03:37:06 11  if it is different, they will store the new identifier and
03:37:13 12  clear the forward.
03:37:15 13        And so I guess the point here is to notice that
03:37:18 14  the claim itself is really focused on the instance of the
03:37:21 15  one message going around the ring.  It doesn't -- it
03:37:23 16  doesn't claim, you know, what happens in response to both
03:37:27 17  messages that are shown in Figure 5.  It's really just
03:37:29 18  focused on what a node does when it detects a fault and
03:37:35 19  what another node does when it receives that message
03:37:38 20  received from the one that detected the fault.
03:37:42 21        So it's sort of -- it's -- I would say Claim 1 and
03:37:45 22  the other claims that are identified in the -- claim --
03:37:48 23  recited in the '253 patent are really focused on sort of a
03:37:53 24  subset of the functionality of the overall protocol.
03:37:55 25        And so, you know, if we have focused on the

03:38:00  1   limitation that's disputed by the parties, it says:
03:38:05  2   Judging by a second node -- and this is in relation to
03:38:08  3   Claim 1.  It's similar in the other claims, with some
03:38:12  4   slight tweaks to the claim language, but it's the same
03:38:15  5   basic functionality that's recited.  It says:  Judging by a
03:38:18  6   second node which receives the fault alarm message whether
03:38:22  7   the identifier contained in the fault alarm message is
03:38:26  8   different from a fault identifier record stored in the
03:38:30  9   second node.
03:38:30  10        So I think a person of ordinary skill in the art
03:38:34  11  reading this claim would -- would wonder a few things.
03:38:40  12  They would say, okay, what is the identifier contained in
03:38:42  13  the fault alarm message?  What is the fault identifier
03:38:45  14  record that's stored in the second node?  And how do I
03:38:48  15  determine whether they are different?  That's the gist of
03:38:52  16  the judging and determining limitations.
03:38:54  17        If you are -- if Your Honor would, I guess, stay
03:38:57  18  on this slide, Slide 6, the first question:  What is the
03:39:04  19  fault identifier -- the identifier, sorry, contained in the
03:39:07  20  fault alarm message?  That's actually answered in the
03:39:10  21  previous limitation which says that the fault alarm message
03:39:12  22  contains an identifier that indicates the first node
03:39:18  23  detecting the link fault.
03:39:20  24        So that's going to be, for example, in the
03:39:21  25  specification, the one example it provides is the source

03:39:24  1  address of the node that detected the link fault, but it's

03:39:27  2  basically something that identifies that node.

03:39:29  3        So that's -- that's what the identifier is.

03:39:32  4        The next question would be:  What is a fault

03:39:35  5  identifier record?

03:39:38  6        So if Your Honor would turn to Slide 9 from our

03:39:47  7  presentation.

03:39:48  8        As I mentioned before, the -- the patent -- the

03:39:51  9  basic setup of the protocol that's described in the patent

03:39:56  10  is that nodes send alarm messages in both directions around

03:40:02  11  the ring when there is a link fault that's detected.  And

03:40:04  12  we provided some exemplary -- exemplary descriptions of

03:40:06  13  that on this slide.

03:40:07  14        On the following slide, Slide 10, we show that

03:40:12  15  there are -- the functionality that is also recited -- and

03:40:16  16  this is sort of common through all of the embodiments

03:40:19  17  described in the specification -- is that each node they

03:40:23  18  maintain a fault identifier record, and that record

03:40:27  19  contains a pair of values, one for each of the nodes' two

03:40:33  20  ports.

03:40:34  21        So like I said before, the -- in the normal

03:40:37  22  situation, the nodes that detect a link fault will send a

03:40:41  23  fault alarm message around the ring.  That means each other

03:40:43  24  node will receive two different messages with two different

03:40:47  25  identifiers.  They're going to save both of those, and

03:40:50  1  they're going to use those to determine whether to clear

03:40:55  2  the forwarding table.

03:40:56  3      So in the situation that's recited in Claim 1

03:41:00  4  which relates to one message going around the ring, it

03:41:03  5  really relates to determining whether the fault identifier

03:41:09  6  that's stored for that port has changed.

03:41:12  7      And so that's -- I think the gist of our proposed

03:41:17  8  construction is that it reflects the fact that Claim 1 is

03:41:19  9  really directed toward the subset of the functionality

03:41:23  10  which is one node -- or, sorry, one message sent by one

03:41:25  11  node, received by another node, and how that -- that second

03:41:29  12  node will determine if the received identifier, which is

03:41:33  13  one value, is different from the values that are stored

03:41:37  14  within the node that receives it, which could be two

03:41:40  15  values.

03:41:41  16      And how does it determine that those are

03:41:43  17  different?  I think there's some ambiguity there.  It's --

03:41:45  18  you know, how do you compare and determine whether one

03:41:47  19  value is different from two values?

03:41:50  20      I think the specification indicates that you do it

03:41:53  21  one way.  You compare that one value to the value -- the

03:41:58  22  one value in the pair that corresponds to the same port on

03:42:02  23  which the message was received.

03:42:04  24      And -- and that's actually reflected consistently,

03:42:12  25  like I said, throughout the specification.  We've produced

03:42:15  1  some -- on the following slide, Slide 11 of our

03:42:23  2  presentation, we produced some -- provided some excerpts

03:42:26  3  and underlining to indicate where we see this in the

03:42:30  4  specification, but it's consistent.  It's -- you know,

03:42:33  5  when -- and -- and I'd like to note that the specification

03:42:38  6  actually uses slightly different language.  It doesn't say

03:42:41  7  do you determine that the received identifier is different

03:42:43  8  from the stored identifier?

03:42:45  9       It actually uses language like -- so, for example,

03:42:51  10  in Column 6, it says:  The mode of the -- of detecting

03:42:55  11  change of the fault identifier is judging whether the

03:42:59  12  source address of the MS message received by the

03:43:02  13  corresponding port in the fault table is changed.

03:43:08  14       So it -- it actually doesn't use the word

03:43:13  15  "different" to describe how this functionality works in the

03:43:16  16  specification.  It -- it says:  Determining whether the

03:43:18  17  fault identifier is changed.

03:43:19  18       In the context of the claims, I think a person of

03:43:22  19  ordinary skill in the art would understand that to mean

03:43:24  20  that the fault identifier for that port is compared to the

03:43:28  21  one that's received.  And if it's different, then the node

03:43:33  22  determines that it's changed, and it will go on and clear

03:43:37  23  the forwarding table.

03:43:38  24       And with that, I'll turn it over to counsel for

03:43:42  25  Huawei, or if Your Honor has any questions, feel free to

03:43:46   1   jump in.

03:43:47   2            THE COURT:  Thank you, Mr. Watkins.

03:43:50   3            Let me hear from Huawei's counsel on these terms.

03:43:57   4            MR. WALDROP:  Thank you, Your Honor.  Alex Waldrop

03:43:58   5   for Plaintiff, Huawei.

03:43:59   6            As an initial matter, I think counsel made the

03:44:05   7   argument that the independent claims here are directed to

03:44:12   8   the subset of the functionality described in the patent

03:44:16   9   specification.  I think that's improper and incorrect, and

03:44:20  10   it's a -- what is -- what I think is -- he's doing -- or

03:44:25  11   counsel is suggesting that there is some negative

03:44:27  12   limitation because the claims don't recite the second

03:44:34  13   message -- second fault alarm message and doing something

03:44:38  14   with that second message.

03:44:40  15            But beyond that, the fundamental reason why

03:44:43  16   this -- why Verizon's proposal should be rejected is that

03:44:46  17   it's imposing a limitation and adding claim language to --

03:44:51  18   language to the claim that limits the claim to a specific

03:44:53  19   embodiment and excludes the more general scope of the

03:44:58  20   patent.

03:44:58  21            In particular, as shown in their slides, they're

03:45:03  22   pointing to a specific embodiment in which the fault

03:45:08  23   identifier record is a pair of source addresses.  That is

03:45:10  24   not the only embodiment described in the patent.  If you --

03:45:15  25   if you have our -- Huawei's claim construction slides in

03:45:21   1   front of you, I'd ask you to turn to Slide 87, which

03:45:26   2   includes several excerpts from the '253 patent

03:45:30   3   specification.

03:45:31   4            THE COURT:  I have it in front of me.

03:45:33   5            MR. WALDROP:  On the left -- oh, sorry, Your

03:45:35   6   Honor.

03:45:35   7            THE COURT:  I have the slide in front of me.

03:45:37   8            MR. WALDROP:  Thank you, Your Honor.

03:45:37   9        In looking to the excerpt on Slide 87 on the right

03:45:45  10   side, the patent even specifies -- uses permissive language

03:45:52  11   that the fault identifier may be a source address pair of

03:45:56  12   the fault alarm message received by two ports.

03:45:59  13        But it -- it further says that the fault

03:46:02  14   identifier may be something else.  It may be an alarm

03:46:05  15   identifier information carried in the fault alarm message.

03:46:08  16        So -- so since the patent itself describes these

03:46:14  17   multiple embodiments, restricting the claim language by

03:46:18  18   adding the additional claim language and modifying the

03:46:21  19   claim language as Verizon suggests would be improper

03:46:23  20   because it would improperly limit the claim to a specific

03:46:28  21   embodiment to the exclusion of others.

03:46:32  22            THE COURT:  All right.  What else?

03:46:34  23            MR. WALDROP:  Your Honor, I think that's

03:46:38  24   sufficient to reject the claim -- to reject their proposal,

03:46:45  25   and I don't think -- unless you have any further questions,

03:46:47   1   I think that's it for me.

03:46:50   2            THE COURT:  Do you have any follow-up,

03:46:54   3   Mr. Watkins?

03:46:55   4            MR. WATKINS:  Yes, just briefly, Your Honor.

03:46:56   5            So when I described the functionality recited in

03:46:59   6   Claim 1 and the other independent claims as a subset of the

03:47:03   7   functionality described in the patent, I didn't mean to

03:47:06   8   imply that it excludes other functionality.  Certain --

03:47:10   9   certainly, the claims are not limited to a situation where

03:47:16  10   there's only one message being sent around on one direction

03:47:19  11   in the ring.  I think -- like I said, the -- the overall

03:47:24  12   invention is about a system where you have messages going

03:47:27  13   in both directions.

03:47:28  14            So it was not my intention to indicate that the

03:47:32  15   claims are not trying -- the claims are excluding anything

03:47:35  16   in the specification.

03:47:36  17            And -- and as to Mr. Waldrop's point on Slide 87,

03:47:43  18   that excerpt that's cited there, it says:  The fault

03:47:48  19   identifier may be a source address pair of the fault alarm

03:47:51  20   message received by two ports, and the fault identifier

03:47:55  21   may -- identifier may be alarm identifier information.

03:48:00  22            I think that reflects the fact that a source

03:48:03  23   address is one particular identifier that can be used.

03:48:10  24   There could be some other type of identifier.  But Claim 1

03:48:14  25   specifically says that it's going to be an identifier

03:48:17   1   that -- make sure I'm not misquoting the language of the

03:48:22   2   claim -- the fault identifier is one that indicates the

03:48:27   3   first node detecting the link fault.

03:48:29   4          So that could be a source address.  It could be

03:48:32   5   something else like an alarm identifier.  So I don't think

03:48:35   6   it indicates that there are embodiments where there is

03:48:40   7   something other than a pair of values stored on each node

03:48:44   8   for the stored identifier information.  I just don't see it

03:48:48   9   in the specification.

03:48:49  10          THE COURT:  All right.  Thank you, counsel, for

03:48:52  11   your arguments in regard to these disputed claim terms.

03:48:56  12          Let's turn next to the '111 patent.  These are the

03:49:04  13   Verizon asserted patents, the '111 and '288.

03:49:11  14          And with regard to the '111, let's take up the

03:49:16  15   disputed language "wherein the first time stamp comprises

03:49:21  16   information reflecting a round trip delay of the network,"

03:49:25  17   and effectively our disputes here center around

03:49:28  18   "reflecting," "reflects," and "reflects."

03:49:33  19          And Huawei's asserted that this language -- or

03:49:37  20   these term -- these claims, rather, are indefinite.

03:49:41  21          Verizon's asserted that their plain and ordinary

03:49:44  22   meaning should apply.

03:49:47  23          Let me hear from Huawei first as to their position

03:49:50  24   on these claims.

03:49:51  25          MR. REICH:  Your Honor, Seth Reich for Huawei.

03:49:57   1         THE COURT:  Please proceed.

03:50:00   2         MR. REICH:  Our slides on this start on 96 of our

03:50:03   3  deck.

03:50:04   4         And so the -- the terms -- they're all the

03:50:08   5  "reflect" terms are treated the same.  And so the issue

03:50:11   6  here is that Verizon's plain and ordinary meaning, it's

03:50:16   7  ultimately the same proposal that they're taking with

03:50:18   8  respect to their alternative construction.  And it's that

03:50:23   9  this term encompasses anything that is used to determine a

03:50:28  10  round trip delay later in the claims.

03:50:30  11         And -- and the issue with that is that this was

03:50:33  12  something that the prior art had, and they distinguished

03:50:38  13  over when actually adding this limitation.  And when you

03:50:41  14  take that out, a person of ordinary skill looking at the

03:50:46  15  term in light of the prosecution history wouldn't know what

03:50:50  16  to do with this term.  I mean, there is no reasonably

03:50:56  17  ascertainable scope in the term once we know that this

03:50:59  18  proposal that Verizon is making is not included.

03:51:05  19         And so if you look at Slide 97 that we have, we

03:51:09  20  have the -- the term itself in an exemplary claim.

03:51:14  21         And so here you see that the first time stamp

03:51:18  22  includes information that reflects a round trip delay of

03:51:23  23  the network, and this is in the first time stamp.

03:51:25  24         One of the issues with this is that this is -- if

03:51:29  25  we're going to take Verizon's proposal, it renders this

03:51:32  1  entire language superfluous, because the -- there's four

03:51:36  2  steps in this claim, as you can see on Slide 97.

03:51:40  3        The generating step indicates that this second

03:51:44  4  time stamp includes information from the first time stamp.

03:51:47  5  And then the fourth step, the transmitting step, says that

03:51:51  6  you use the second time stamp to measure the round trip

03:51:57  7  delay.

03:51:57  8        And so, in effect, what Verizon is trying to say

03:52:01  9  that the wherein the information reflects a round trip

03:52:05  10  delay term means is already included in the scope of the

03:52:09  11  claims by the fact that the second time stamp includes that

03:52:14  12  first time stamp information and that the second time stamp

03:52:17  13  is then used to measure the round trip delay, and so it's

03:52:20  14  already there.

03:52:20  15        Now, the key issue with that is the -- during the

03:52:26  16  prosecution, the examiner rejected these claims with the

03:52:29  17  other limitations in them over a combination that involved

03:52:35  18  a prior art reference called Edmison and -- and two other

03:52:40  19  references that were combined.  And there's a series of

03:52:43  20  history that gets us to this, I think, key rejection and

03:52:47  21  then the amendment that comes after it which involves the

03:52:50  22  addition of the wherein the information reflects a round

03:52:53  23  trip delay term.

03:52:54  24        And so, you know, we put all the slides in here,

03:52:58  25  but just trying to cut to what's the most important one, if

03:53:04  1  you can skip to Slide 101.  And here we have sort of the

03:53:11  2  ultimate, I guess, conclusion of the claim itself, which is

03:53:16  3  the -- on the left, we have the file history.  I realize

03:53:19  4  it's rather small, but we have this in our brief, where the

03:53:22  5  examiner maps Edmison to the calculation of the round trip

03:53:28  6  delay or the measuring at the -- with the second time stamp

03:53:33  7  that the examiner identified in Edmison.

03:53:36  8        And what that is, is the second time stamp

03:53:38  9  includes this information $T_{A2}$, $T_{A1}$, $T_{z2}$, and $T_{z1}$.  And what

03:53:45 10  that means is from the -- the box from -- on the right

03:53:48 11  side, the top box, which is from Edmison, Paragraph 50, and

03:53:52 12  it's source received time minus source transmission time

03:53:56 13  minus the destination delay time, which is that $T_{z2}$ minus

03:54:02 14  $T_{z1}$, equals latency or round trip delay.

03:54:07 15        And the key point here is -- and we can see it if

03:54:11 16  we just go back one slide, and we can look at Edmison

03:54:14 17  Figure 4, is that time stamp -- the first time stamp that

03:54:20 18  the examiner identified in the Edmison reference is time

03:54:26 19  stamp 110 and includes that time $T_{A1}$.

03:54:31 20        And so the Edmison reference had information in

03:54:35 21  the first time stamp identified by the examiner that was

03:54:38 22  used in the calculation we just looked at on my Slide 101.

03:54:43 23  And that's all it is.

03:54:44 24        And so what happened next was that you can see it

03:54:49 25  on Slide 102 of our deck.  The applicants amended the

03:54:53  1  claims to include this key limitation of wherein the

03:54:57  2  information reflects a round trip delay.  That's on the

03:55:02  3  right.  It's also from the file history at 294, and that's

03:55:05  4  both the Bates number and the page number because this was

03:55:08  5  the first exhibit produced by Verizon.

03:55:12  6          And what they said in response, after they made

03:55:15  7  this amendment, was that they respectfully submitted that

03:55:18  8  the portions of Edmison and the two other references, Ofek

03:55:22  9  and Fujimori, that were cited by the examiner did not

03:55:25  10  disclose this limitation.

03:55:26  11          What you cited does not meet this.  And -- and

03:55:30  12  then the examiner allowed the claims as a result.  But what

03:55:34  13  they're doing here now is they're precisely applying these

03:55:38  14  things -- this limitation, wherein the information

03:55:41  15  reflects -- reflects a round trip delay, on to prior art

03:55:47  16  that effectively would just apply to Edmison.

03:55:55  17          THE COURT:  Let me ask you this.

03:55:59  18          MR. REICH:  One of the -- okay.

03:55:59  19          THE COURT:  Let me ask you this.

03:55:59  20          MR. REICH:  Sorry, Your Honor.

03:56:00  21          THE COURT:  You've told me a lot about what these

03:56:01  22  prior art references say, but what I'm looking for is for

03:56:05  23  you to show me some evidence of what Verizon intended to

03:56:12  24  surrender.  Not what the reference says, but something that

03:56:16  25  indicates the intention to unequivocally surrender scope

03:56:21  1  that would give rise to the prosecution history estoppel

03:56:24  2  argument you're making.

03:56:26  3       MR. REICH:  Yes.

03:56:28  4       THE COURT:  Can you focus on that rather than just

03:56:30  5  what the prior art references may or may not include in

03:56:33  6  themselves?

03:56:35  7       MR. REICH:  Certainly, Your Honor.

03:56:36  8       I think you would see it on 102.  The key is that

03:56:40  9  after having the examiner point out all of this, that the

03:56:45  10 examiner had mapped every single element that I just talked

03:56:49  11 about.  That's when Verizon said:  What you mapped does not

03:56:52  12 meet our new limitation.

03:56:53  13      And so that is specifically on 304 of the file

03:56:58  14 history, the '111 patent file history, and it's where

03:57:01  15 they -- the applicant submits that the cited portions --

03:57:04  16 the cited portions which we just discussed do not meet this

03:57:08  17 limitation.  And I -- I think that is the key because these

03:57:12  18 are portions all that were cited by the examiner.

03:57:17  19      I'll -- I'll address one of Verizon's counter

03:57:20  20 arguments to this on my Slide 103.  It's addressing the

03:57:26  21 issue they raise on their Slide 10.  They say that, oh,

03:57:29  22 they had another argument, so it's not clear, and it -- and

03:57:35  23 unambiguous, a disclaimer, that the round trip -- sorry,

03:57:42  24 the time $T_{A1}$ was being updated.  This is something that was

03:57:45  25 made in the file history, but it was made before this

03:57:47  1  critical rejection and this critical amendment, and I think

03:57:51  2  that's what's key.

03:57:52  3          We cited page numbers, but the -- the critical

03:57:58  4  rejection is on Page 252.  And the critical language that

03:58:02  5  we're relying on for the disclaimer issue is on 304, at

03:58:06  6  which they did not make this argument.  And this argument,

03:58:09  7  I think, is wrong.  Just as an application of Edmison, the

03:58:14  8  examiner rejected it.  And we can look at Edmison,

03:58:16  9  Paragraph 63, to show that time $T_{A1}$ is the time of the

03:58:23 10  transmission, as the examiner recognized.  It's not the

03:58:27 11  time that's being updated.  It -- that wouldn't make the

03:58:30 12  calculation using time $T_{A1}$ make sense.  Edmison 50 and 65,

03:58:36 13  which the examiner relied on for that calculation to the

03:58:39 14  round trip delay, identified as the source transmission

03:58:42 15  time -- the time at node A at the time of transmission.

03:58:46 16          So the argument that Verizon is making now was

03:58:49 17  rejected by the examiner, and it wasn't made when they were

03:58:52 18  making the arguments against the cited portion on which

03:58:57 19  we're relying for the disclaimer.

03:58:59 20          So I think those are the key points.  I'm happy to

03:59:02 21  talk about the file history or Edmison more, but those were

03:59:05 22  the key points that we wanted to make.

03:59:07 23          With respect to the indefiniteness, once we remove

03:59:10 24  what Verizon is arguing this term means, our expert talked

03:59:17 25  about how there's no other discernible scope.

03:59:21    1              And so I'd be happy to address any other

03:59:23    2    questions, but that's all we have.

03:59:25    3              THE COURT:  All right.  Thank you for your

03:59:26    4    argument.

03:59:26    5              Let me hear from Verizon's counsel on this.

03:59:29    6              MR. MACK:  Thank you, Your Honor.  Good afternoon.

03:59:33    7    This is Brian Mack.

03:59:34    8              Can you hear me?

03:59:39    9              THE COURT:  I can.  Please proceed.

03:59:43   10              MR. MACK:  Thank you, Your Honor.

03:59:44   11              I think you spotted the issue here.  There is no

03:59:48   12    clear disclaimer or disavowal in the file history.  If we

03:59:51   13    just go back to Huawei's Slide 102 that counsel just

03:59:59   14    pointed us to, you can see here on the yellow highlight on

04:00:02   15    the left, the applicant's remarks in the file history

04:00:05   16    were -- were not just referencing Edmison.  It was Edmison,

04:00:10   17    Ofek, and Fujimori.  It wasn't just in connection with the

04:00:15   18    wherein limitation that was added.  It says that those

04:00:16   19    references don't show the extracting clause with the

04:00:21   20    wherein limitation, and they also don't show the generating

04:00:24   21    clause.

04:00:25   22              So the references were actually distinguished on

04:00:27   23    multiple different grounds, not just the addition of this

04:00:30   24    wherein clause.  And it wasn't -- and it looks like there's

04:00:32   25    a dispute between the experts and the parties on what the

04:00:35  1  Edmison reference does or does not disclose.

04:00:37  2       But even if you agree with everything that counsel

04:00:40  3  said, there's nothing in the file history that amounts to a

04:00:44  4  clear disclaimer or disavowal that would rise to the level

04:00:48  5  of prosecution history disclaimer.

04:00:50  6       I just -- I looked through all these slides, and I

04:00:53  7  just -- I just don't see it.

04:00:56  8       If you have Verizon's slides in front of you, we

04:00:59  9  did have one slide on the file history -- Verizon slides

04:01:02  10  for the '111 and '288 patent.  If you turn to Slide No. 10,

04:01:09  11  our expert actually looked at the file history in a lot of

04:01:09  12  detail.  He -- he notes that the Request for Pre-Appeal

04:01:16  13  Conference in the file history, Paragraph 72 of Dr. Min's

04:01:21  14  declaration.  And he says that the Edmison reference was

04:01:25  15  actually distinguished on multiple different grounds, and

04:01:29  16  is quite dissimilar from the claimed invention.  Then --

04:01:30  17  I'm sorry, was there a question?

04:01:31  18       THE COURT:  No.  Go ahead.

04:01:32  19       MR. MACK:  And then in Paragraph 73, he actually

04:01:37  20  explains why the Edmison reference does not show a time

04:01:40  21  stamp that includes information reflecting a round trip

04:01:44  22  delay.  And that's precisely what opposing counsel just

04:01:48  23  mentioned.

04:01:48  24       In Edmison, that $T_{A1}$ value is overwritten by the

04:01:53  25  current network processor time.  So there -- there is a $T_{A1}$

04:01:58  1  value in both the first and second time stamp.  But it's

04:02:02  2  overwritten so that that value is no longer reflecting

04:02:05  3  round trip delay, it's not reflecting one -- the one-way

04:02:07  4  delay.  It's a completely new value once it gets to the

04:02:09  5  destination.

04:02:10  6       Just -- just briefly, Your Honor, regarding the

04:02:15  7  scope of this claim, if you would -- if you could look at

04:02:18  8  Slide No. 5, Claim No. 1 is -- is pretty clear.  It says

04:02:23  9  that the first time stamp -- there's information that's

04:02:27  10  extracted.

04:02:29  11       THE COURT:  Mr. Mack, is this your Slide 5 or is

04:02:32  12  this -- or is this Huawei's Slide 5?  You said Slide 5 --

04:02:38  13       MR. MACK:  Yeah, if you could go to Verizon's

04:02:40  14  Slide No. 5 for the '111 and '288 patents.  Do you have --

04:02:45  15  do you have that slide deck?

04:02:46  16       THE COURT:  I do.  I just wasn't sure which one.

04:02:47  17  You -- you all have been jumping back and forth between

04:02:50  18  each other's slides, so I just wanted to be sure I was

04:02:53  19  looking at the one you intended.  Go ahead.

04:02:56  20       MR. MACK:  To make it more confusing, I think we

04:03:00  21  renumbered our slides from 1 each patent, and I think

04:03:04  22  Huawei has a running number.

04:03:05  23       But our -- our Slide No. 5 -- Verizon's Slide No.

04:03:07  24  5 shows Claim 1.  You can see in the extracting step,

04:03:11  25  Limitation No. 2, you're extracting information of the

04:03:15  1   first time stamp.  And then in -- in the blue highlight,

04:03:18  2   it's wherein the information reflects the round trip delay

04:03:20  3   of a network.

04:03:21  4        And then later on at the end of the same claim,

04:03:23  5   you actually do the actual measurement of that round trip

04:03:26  6   delay.  You see where it says that the last -- the last

04:03:30  7   clause highlighted in green, wherein the second time stamp

04:03:32  8   is used to measure the round trip delay.

04:03:36  9        So it's clear that the word "reflecting" doesn't

04:03:39  10  mean it is the round trip delay because the round trip

04:03:42  11  delay is not measured until the last step.

04:03:45  12       So the word "reflect" was used in these claims to

04:03:48  13  have a very broad meaning, and it was intentionally broad

04:03:51  14  to cover the various embodiments that are described within

04:03:55  15  the specification.

04:03:56  16       And the following slides -- Verizon Slide 6, 7,

04:04:01  17  and 8 go into the various different ways that the round

04:04:05  18  trip delay or the latency can be measured.  The -- the

04:04:09  19  flowcharts are shown in the patents in Figures 6 and 7.

04:04:13  20       But there's nothing superfluous.  I think opposing

04:04:16  21  counsel said it would render the claims superfluous,

04:04:19  22  this -- this "reflect" term.  If you look at the term again

04:04:23  23  on Verizon Slide 5, it's the first time stamp that has

04:04:28  24  information that reflects the round trip delay.  The

04:04:30  25  measuring of the round trip delay is used based off a

04:04:33   1   second time stamp where we have it in green here.  So

04:04:36   2   there's nothing superfluous.  It's two different

04:04:39   3   limitations addressing two different time stamps.

04:04:42   4           THE COURT:  Let me ask you this.  How would you

04:04:43   5   respond on behalf of Verizon to a comment that says:  In

04:04:48   6   one breath Verizon says how different it is from Edmison,

04:04:55   7   and then in the next breath seeks a claim construction that

04:04:58   8   covers that --

04:05:03   9           MR. MACK:  Well, I -- I would agree that that

04:05:05   10   would be inappropriate, but that's not what's happening

04:05:07   11   here.

04:05:07   12           In Edmison, as I explained, and if you look at our

04:05:11   13   Slide -- Verizon Slide No. 10 --

04:05:13   14           THE COURT:  Could you slow down just a little bit,

04:05:15   15   Mr. Mack?

04:05:16   16           MR. MACK:  Sure.

04:05:17   17           THE COURT:  Okay.  Go ahead.

04:05:20   18           MR. MACK:  If you could turn to Verizon's Slide

04:05:22   19   No. 10.

04:05:24   20           THE COURT:  I have it.

04:05:25   21           MR. MACK:  There's two paragraphs of disclosure

04:05:30   22   here from our expert, Dr. Min, who analyzed the Edmison

04:05:35   23   reference and the file history.  And he explains here why

04:05:37   24   the claimed invention is actually quite dissimilar from

04:05:40   25   Edmison.

04:05:43   1          And even if you look -- and he explains in
04:05:46   2   Paragraph 73 why Edmison does not disclose a time -- a
04:05:51   3   first time stamp that includes information reflecting a
04:05:54   4   round trip delay.  And that's because in Edmison, the time
04:05:59   5   stamp was overwritten when it was received at the
04:06:01   6   destination.  And then a new time stamp, the new current
04:06:05   7   time was inserted into that time stamp and sent back.
04:06:10   8          So Edmison would not read on our alternative
04:06:13   9   construction.  But, again, it's Verizon's position that
04:06:15  10   this -- this term doesn't need construction.  It's plain
04:06:18  11   and ordinary meaning.  And you would under -- a person of
04:06:21  12   ordinary skill in the art would understand what it means
04:06:22  13   for information to reflect the round trip delay.  And that
04:06:26  14   can be, you know, a factual issue that the jury can decide
04:06:32  15   whether or not the -- you know, that the accused products
04:06:34  16   practice that limitation.
04:06:35  17          THE COURT:  All right.  Thank you.
04:06:38  18          Mr. Reich, do you have any follow-up on this
04:06:40  19   matter?
04:06:41  20          MR. REICH:  Briefly, Your Honor.
04:06:42  21          So going back to the point about -- as you
04:06:47  22   mentioned, what would Verizon say on the response -- in one
04:06:51  23   breath, they say Edmison doesn't cover it.
04:06:54  24          I think, Your Honor, if you go and look at
04:06:56  25   Paragraph 63 of Edmison and additionally Paragraph 50 and

04:06:59   1   65, you will see that the argument that they're making on

04:07:03   2   Edmison is just wrong.  The examiner rejected it.  You can

04:07:07   3   see that.

04:07:10   4          On our Slide 103, they -- the examiner rejected it

04:07:14   5   after they made it.  And it was only after that rejection

04:07:17   6   did they make these amendment to include this term.

04:07:21   7          And, again, I point to the information we have on

04:07:24   8   Slide 102 for the disclaimer where they said what was cited

04:07:29   9   is not met by this limitation.

04:07:31   10          That's all we have.

04:07:33   11          THE COURT:  All right.  Thank you, counsel.

04:07:34   12          Let's go next to the first time stamp is or was

04:07:45   13   inserted from Claims 1 and 12 and 6, 16, 26, 30, and 22 of

04:08:01   14   the '288 patent.

04:08:03   15          Let me hear from Huawei first here, please.

04:08:06   16          MR. REICH:  Your Honor, somewhat similar to the

04:08:10   17   last term, what we have here is a file history that

04:08:14   18   ultimately there's a number of rejections and ends up with

04:08:17   19   a limitation.  And what we see Verizon doing is now they're

04:08:21   20   trying to encompass what they added this limitation to get

04:08:24   21   around.

04:08:25   22          And I'm just going to cut to the chase because I

04:08:27   23   know Your Honor wants to know where's the clear and

04:08:31   24   unambiguous disclaimer that we're pointing to.  And we go

04:08:34   25   through all the file history, but specifically -- excuse

04:08:38 1  me, Your Honor, go to Page 129 of -- of the Huawei

04:08:44 2  presentation.

04:08:44 3        It's on the right side of the citation that we

04:08:49 4  have, and where they say:  In addition, the -- inserting

04:08:54 5  the first time stamp into the portion of the optical

04:08:58 6  overhead based on identifying the first time stamp and

04:09:00 7  inserting into the portion of the optical channel

04:09:06 8  overhead --

04:09:06 9        THE COURT:  Slow down.

04:09:07 10        MR. REICH:  Yeah, I -- I read that too quickly.

04:09:10 11        THE COURT:  Yes, I'll agree with you about that.

04:09:12 12        MR. REICH:  So what this is, is they're responding

04:09:16 13  to the examiner's rejection of the claims as they existed

04:09:22 14  in response to the Ofek prior art reference.

04:09:26 15        And what -- what they say is the inserting the

04:09:33 16  first time stamp into the portion of the optical channel

04:09:37 17  overhead based on identifying the first time stamp and

04:09:42 18  inserting into the portion of the optical channel overhead

04:09:47 19  that is assigned for the first time stamp -- I added the

04:09:52 20  "is" there, I think there's a typo -- disclosed by Ofek is

04:09:56 21  not the limitation that they added -- the limitation

04:09:59 22  they're trying to construe.

04:10:00 23        And so they are specifically saying inserting a

04:10:03 24  time stamp into the portion assigned for it is not what our

04:10:07 25  limitation means, but that is what they are trying to claim

04:10:10   1   it means under the guise of plain meaning in this case.

04:10:15   2          And what we have here -- on 125, you can see the

04:10:19   3   actual rejection, which is basically the examiner had found

04:10:23   4   that the Ofek reference met everything in the claim as it

04:10:28   5   existed, and that Ofek taught inserting the time stamp into

04:10:33   6   the portion of the overhead assigned to it.  That's what

04:10:36   7   they said:  No, our new amendment doesn't do that.

04:10:41   8          THE COURT:  Let me ask you --

04:10:42   9          MR. REICH:  And so --

04:10:43  10          THE COURT:  Let me ask you this, Mr. Reich.  Are

04:10:45  11   you arguing for some kind of preclusive effect or

04:10:51  12   prosecution history estoppel here that would render these

04:10:56  13   claims indefinite or invalid in some way?  What -- what --

04:10:59  14   I guess let me ask the question a different way.  What's

04:11:03  15   the real dispute here between Huawei and Verizon as you

04:11:06  16   understand it?

04:11:07  17          MR. REICH:  In this term, Your Honor, the real

04:11:09  18   dispute is we just want this amend -- this term here to not

04:11:17  19   be able to be -- effectively be attempting to get a

04:11:21  20   negative limitation through our proposed construction.

04:11:24  21          But as our expert explained, the issue is this is

04:11:28  22   a fixed arrangement the way we see them reading it, the way

04:11:33  23   the Ofek reference taught, inserting into a portion that's

04:11:37  24   pre-assigned, that's assigned, as opposed to making a

04:11:39  25   determination that varies based various characteristics.

04:11:45   1           And so our proposal was to give the plain meaning.

04:11:48   2   We think it is the plain meaning of the term, but we have

04:11:50   3   an 02 Micro dispute here because what we see here is

04:11:54   4   Verizon is trying to read this claim on to what they had

04:12:00   5   claimed during prosecution.

04:12:02   6           THE COURT:  How do -- how do we have an 02 Micro

04:12:04   7   dispute in the middle of claim construction?

04:12:06   8           MR. REICH:  Well, we see that if we were to

04:12:08   9   continue down the path without construing the claim.

04:12:11  10           THE COURT:  All right.  Mr. Mack, what does

04:12:17  11   Verizon say here?

04:12:18  12           MR. MACK:  Thank you, Your Honor.

04:12:18  13           If you -- if you could turn to Verizon's slides, I

04:12:24  14   wanted to start with Slide No. 30.

04:12:30  15           Do you -- you see here, this slide just has the

04:12:33  16   claim language on the left and then Huawei's proposed

04:12:36  17   constructions on the right.  You'll see that what Huawei is

04:12:40  18   trying to do is they're trying to insert an active

04:12:45  19   determining step into -- the claim limitations vary

04:12:49  20   slightly -- there's a variance, but all of Huawei's

04:12:53  21   proposed constructions have a new determining step.

04:12:55  22           And I think you heard Mr. Hamad say in connection

04:12:58  23   with the '236 patent that that phrase "if" -- if something

04:13:03  24   needs to be increased or doesn't need to increase, that

04:13:03  25   that's not actually a determining step.  And that's not in

04:13:06  1   the claim.  And that's not a requirement of the claim.

04:13:08  2          So it's surprising that in the '236 patent,

04:13:14  3   they're arguing that there is no active determining step

04:13:14  4   when you have a -- an express condition in the claim, but

04:13:18  5   here they are arguing that there is an active determining

04:13:19  6   step when there's -- there's no -- the word "determining"

04:13:23  7   isn't even in the claim.  All the claim says is that the

04:13:27  8   first time stamp was inserted on --

04:13:29  9          THE COURT:  Could I ask you to slow down a little

04:13:31  10  bit, please?  It's been a long day.

04:13:33  11         MR. MACK:  Sure.

04:13:34  12         THE COURT:  Thank you.

04:13:35  13         MR. MACK:  All -- all that this claim has on the

04:13:38  14  left is that it says:  Wherein the first time stamp was

04:13:43  15  inserted based on at least a characteristic of that time

04:13:48  16  stamp.

04:13:48  17         So what -- what you have Huawei doing is they're

04:13:53  18  trying to eliminate any embodiments where a -- a time stamp

04:13:57  19  is preassigned to a certain overhead portion.  So if you

04:14:02  20  have -- if -- if you have a system that supports multiple

04:14:04  21  time stamps, Type A and Type B, so you're clearly looking

04:14:08  22  at the characteristics of the -- the time stamp, including

04:14:11  23  the type of the time stamp, if you insert Time Stamp Type A

04:14:17  24  into a fixed portion and then you insert Time Stamp Type B

04:14:21  25  into a different fixed portion, they're somehow saying that

04:14:24  1  you didn't insert the time stamp based on the

04:14:28  2  characteristic of the time stamp wherein that

04:14:29  3  characteristic is the type of time stamp.  It doesn't

04:14:32  4  really make sense.

04:14:33  5         They're -- they're trying to import a new active

04:14:35  6  limiting step and read out express embodiments in the

04:14:40  7  specification.  And that's -- if you look at Verizon's

04:14:44  8  Slide No. 32, we have a citation to the '288 patent, Column

04:14:51  9  6, starting at Line 31.  The specification covers

04:14:55  10  embodiments where based on the type of time stamp, you're

04:15:00  11  going to be inserting it into a certain overhead portion,

04:15:04  12  and if you have a second type of time stamp, you'll insert

04:15:07  13  it into a different overhead portion.

04:15:09  14         The claim doesn't require you to actively

04:15:11  15  determine the type of time stamp each time you insert the

04:15:16  16  time stamp.  That could have been done prior to these

04:15:19  17  steps, and then when you get to the steps of the claim, you

04:15:22  18  just -- you already know where to insert the time stamp

04:15:24  19  because you have two different types, and you're putting

04:15:27  20  one type into one location and the next type into a --

04:15:31  21  another location.

04:15:32  22         So if you go to the next slide, Slide 33, we think

04:15:36  23  this is doing exactly what the Accent Packaging case law

04:15:41  24  says you cannot do is that you're excluding a preferred

04:15:49  25  embodiment which is rarely, if ever, correct.

04:15:49  1          I wanted to just address the prosecution history

04:15:52  2  remarks from counsel.  Again, I don't see any clear

04:15:53  3  disclaimer here.  All I see is the applicant quoting the

04:15:58  4  claim language and saying that the Ofek reference does not

04:16:02  5  disclose that claim language.

04:16:05  6          If you turn to Verizon's Slide No. 34, here we

04:16:12  7  have call-outs from the file history.  And the applicant on

04:16:19  8  the left says that Ofek -- the Office Action relies on Ofek

04:16:26  9  to disclose wherein the time stamp is inserted into a

04:16:30  10  portion of the overhead, and it's based on the

04:16:36  11  characteristics.

04:16:36  12          But then if you go on, it says that Ofek, in

04:16:39  13  combination with Edmison and Fujimori, failed -- failed to

04:16:47  14  disclose that limitation.  And it's actually -- if you go

04:16:50  15  to the next -- the next page, the failure in Ofek is

04:16:53  16  actually related to the various overhead portions.  It's

04:16:57  17  not a failure of the characteristic part of the claim

04:17:01  18  language.

04:17:02  19          The Ofek actually didn't describe the different

04:17:06  20  overheads, the -- the optical channel overhead, the optical

04:17:11  21  channel transporting unit overhead, the optical channel

04:17:15  22  data unit overhead, and the optical channel payload unit

04:17:17  23  overhead.  So there were various overhead fields that are

04:17:22  24  recited in the claims that Ofek did not disclose.

04:17:26  25          So, again, we don't -- just like with the last

04:17:29  1  term, we don't see any clear prosecution history disclaimer

04:17:33  2  or clear disavowal anywhere in the file history.  So we

04:17:37  3  think it would be improper to -- to limit this term in any

04:17:40  4  way.

04:17:42  5          THE COURT:  All right.  Mr. Reich just told me

04:17:43  6  that if I adopt your plain and ordinary meaning, as you've

04:17:47  7  urged, I am guaranteed to have an 02 Micro problem at the

04:17:53  8  most inopportune time later in this case.  What's your

04:17:58  9  response to that?

04:17:59  10          MR. MACK:  I don't believe that's true.  I mean,

04:18:00  11  the claim language is clear.  It's a wherein clause, and it

04:18:03  12  says:  Wherein the time stamp was inserted based on a

04:18:09  13  characteristic of that time stamp.

04:18:11  14          I think the jury can take that language and apply

04:18:16  15  it.  It's a factual dispute, and they can determine whether

04:18:20  16  or not Verizon's infringement read on the accused

04:18:22  17  products -- the accused products perform that limitation.

04:18:25  18          THE COURT:  Well, I do think it's a little unusual

04:18:28  19  that on -- as I see it, every one of the Huawei patents,

04:18:35  20  Huawei told me plain and ordinary meaning was just fine,

04:18:41  21  and now when we get to the Verizon patents, if I adopt

04:18:46  22  plain and ordinary meaning, it would unavoidably set the

04:18:48  23  stage for an 02 Micro problem later in the case.  I don't

04:18:51  24  know how it can be one way on one set of patents and not

04:18:55  25  another way on the other set of patents.

04:18:58  1          Let me ask Mr. Reich to address that a little

04:19:01  2  further for me.

04:19:02  3          MR. REICH:  Yes.  Yes, Your Honor.

04:19:03  4          I think the key here is the unique prosecution

04:19:05  5  history with respect to Verizon's patents.  No one was

04:19:08  6  arguing prosecution disclaimer for the '236 patent that was

04:19:15  7  mentioned earlier.

04:19:16  8          With respect to some of the arguments that were

04:19:20  9  made, I'll start with the argument that was made about what

04:19:27  10  the specification specifically indicates.  That was on

04:19:33  11  Verizon's Slide 32.  We're not going to exclude any kind of

04:19:40  12  embodiments here.  I think the key with this embodiment,

04:19:45  13  and our expert discussed it -- that is on our Slide 121.

04:19:49  14          The embodiment described in the specification is

04:19:54  15  one where the system is not a fixed system.  It's not

04:19:58  16  assigning the time -- putting the time stamp or inserting

04:20:01  17  the time stamp into a place that's assigned for it.  It's

04:20:05  18  making some sort of choice -- there's a choice.  It varies,

04:20:12  19  and it depends on the characteristics.  And I think that is

04:20:17  20  the key, and that is what was used to get around the prior

04:20:21  21  art.

04:20:21  22          If we go to their -- Verizon Slide 34, there's

04:20:29  23  various embodiments in the prosecution that are discussed,

04:20:32  24  but what's not on this slide is the key piece, which is on

04:20:36  25  our Slide 129 and discussed by our expert, which is the

04:20:42  1  '288 patent file history that I read, albeit fast, where

04:20:47  2  Verizon said:  What our new addition to this claim means is

04:20:52  3  not inserting the time stamp into the portion of the

04:21:00  4  overhead that was assigned for it.

04:21:02  5          And so that is what we're trying to exclude

04:21:04  6  because Verizon excluded it.  It's not that all -- all

04:21:11  7  particular patents should have things excluded.  We think

04:21:13  8  the plain language excluded this.  We think that's what the

04:21:19  9  based on is supposed to mean, a varied system, not a fixed

04:21:21  10 system, as our expert has talked about.

04:21:25  11          But they in prosecution made that argument to the

04:21:27  12 Patent Office, and so for them to, you know, come in -- we

04:21:31  13 have this dispute because -- and I have this as the last

04:21:36  14 slide, 131.

04:21:36  15          What they're reading this on, and I don't want to

04:21:38  16 get into infringement -- is a fixed system.  PTP messages

04:21:45  17 is always done at the same spot.  They always do.  The

04:21:49  18 standard decided.  It's not that the system, you know,

04:21:51  19 decided it.

04:21:52  20          And so it's a fixed arrangement they're trying to

04:21:54  21 read it on, and that is what was disclaimed in prosecution.

04:21:58  22          THE COURT:  All right.

04:22:02  23          MR. MACK:  Just briefly, if I may, Your Honor?

04:22:04  24          THE COURT:  Very briefly.

04:22:05  25          MR. MACK:  I -- I don't think Verizon disputes

04:22:09   1   that you have to take a characteristic of the time stamp

04:22:12   2   into account when you're inserting the time stamp.  It's

04:22:16   3   just when -- when you have to take it into account.

04:22:20   4   There's nothing in the plain language of the claim that

04:22:22   5   prohibits a system designer or the person writing a

04:22:26   6   standard to fix -- to take into account the type of time

04:22:30   7   stamp when designing the standard, and if they know the

04:22:33   8   standard supports two different types of time stamps,

04:22:37   9   always insert Type A into a certain location and always

04:22:40   10   insert Type B into a second location, that clearly meets

04:22:44   11   the plain language of the claims.

04:22:45   12          What Huawei is trying to do is take this active

04:22:49   13   determining step and then add a temporal requirement that

04:22:52   14   you have to actually actively determine the characteristic

04:22:54   15   of the time stamp at the time when you're going to be

04:22:57   16   inserting it.  It's just not anywhere in the claim.  It's

04:23:00   17   not anywhere in the file history.  It's not even close to

04:23:02   18   any arguments that were made to the examiner.

04:23:05   19          So we would -- that's why we think that Huawei's

04:23:09   20   interpretation is incorrect.

04:23:11   21          THE COURT:  All right.  Thank you, counsel, for

04:23:13   22   your argument on these terms.  That appears --

04:23:19   23          MR. REICH:  Your Honor, if I may?

04:23:20   24          THE COURT:  Do you have something else?

04:23:22   25          MR. REICH:  Sorry.

04:23:23  1          THE COURT:  Do you have something else, Mr. Reich?

04:23:25  2          MR. REICH:  Yes, Your Honor.  Just -- we did

04:23:27  3  propose an alternative.  It's -- it's cited on our Footnote

04:23:31  4  10 that's addressed on Page 31 of their slide deck.

04:23:36  5          To the extent the determining step gives the Court

04:23:39  6  any concern, the alternative would be to just read in a

04:23:42  7  negative limitation precisely in line with the disclaimer.

04:23:42  8          THE COURT:  All right.

04:23:46  9          MR. REICH:  Thank you, Your Honor.

04:23:46  10          THE COURT:  Duly noted.

04:23:47  11          Okay.  Those appear to be the terms the parties

04:23:54  12  have agreed on for oral argument as a part of the claim

04:23:59  13  construction today, and these arguments are under

04:24:01  14  submission.

04:24:01  15          The Court is also aware in the parties' most

04:24:06  16  recent filing that the remaining disputed terms have been

04:24:10  17  stipulated to be decided on the papers.  However, I will

04:24:15  18  note that there's also a section of agreed terms that the

04:24:20  19  parties have agreed to.  There are -- there are a grouping

04:24:26  20  or there is a grouping, I should say, in Document 135 of

04:24:30  21  agreed terms, beginning on Page 8 of that filing.

04:24:35  22          I don't know if your most recent filing is going

04:24:39  23  to change that.  The copy of your most recent filing that I

04:24:46  24  have doesn't have a file mark on it.  It came in late this

04:24:50  25  morning before we began claim construction.

04:24:55  1          I just want to make sure and be clear on the

04:24:57  2     record as to what the parties' position are -- or parties'

04:25:02  3     positions are on these agreed and undisputed terms.

04:25:05  4          Are you gentlemen satisfied or is counsel present

04:25:09  5     satisfied that the filings on the docket with the Court

04:25:14  6     adequately memorialize and identify the agreements of the

04:25:18  7     parties on those claim terms that are not in dispute?

04:25:26  8          Do we need to do something -- I should ask it

04:25:30  9     another way.  Do we need to do something to more clearly

04:25:33  10    memorialize your area of agreement, or are you satisfied

04:25:37  11    that that's covered adequately by what's on file?

04:25:41  12          MS. ACHARYA:  Your Honor, the terms that we set

04:25:42  13    forth that are agreed that are on file are the agreed

04:25:46  14    terms.  We'll also file what we just sent to the Court this

04:25:50  15    morning which shows just the terms that we're going to rely

04:25:51  16    on (audio drops) for, but there are no other terms that the

04:25:55  17    parties (audio drops).

04:25:56  18          THE COURT:  Okay.  So the -- the unfiled copy you

04:25:58  19    sent me this morning that I've used for the priority of the

04:26:01  20    arguments this afternoon doesn't change any of the agreed

04:26:05  21    terms that were set forth in Document 135 that was

04:26:08  22    previously filed with the clerk; is that correct, counsel?

04:26:11  23          MS. ACHARYA:  That's correct.

04:26:12  24          THE COURT:  Okay.

04:26:15  25          MR. REICH:  That's correct.

04:26:15  1          THE COURT:  Both sides agree to that?

04:26:17  2          MS. ACHARYA:  Yes, Your Honor.

04:26:19  3          MR. REICH:  Yes, Your Honor.

04:26:20  4          THE COURT:  Okay.  All right.  As I say, these

04:26:22  5   disputed terms that I've heard argument on are under

04:26:25  6   submission.  The remaining disputed terms that the parties

04:26:28  7   have agreed should be considered and decided on the papers

04:26:32  8   are also under submission.

04:26:35  9          I will endeavor to get the parties some written

04:26:38  10  guidance by way of a claim construction opinion as soon as

04:26:42  11  practical.

04:26:42  12         Are there other matters that we need to take up

04:26:44  13  today that the parties are aware of that the Court hasn't

04:26:49  14  otherwise covered?

04:26:50  15         Is Huawei aware of anything we've overlooked?

04:26:53  16         MS. ACHARYA:  Not from Verizon, Your Honor.

04:26:55  17         THE COURT:  How about from Huawei?

04:26:57  18         MR. REICH:  Not from Huawei, Your Honor.

04:26:59  19         THE COURT:  All right.  Let me remind you, as I'm

04:27:03  20  sure you're aware, that the Court's current policy provides

04:27:07  21  for a window beginning upon the issuance of my claim

04:27:10  22  construction order for both sides to meet and confer and

04:27:13  23  advise the Court as to whether you believe, in light of the

04:27:17  24  claim construction opinion, that mediation would be

04:27:20  25  appropriate in the case, and if so, is there a potential

04:27:23   1   agreement between the parties on a mediator?  I'll look for

04:27:27   2   that during the period immediately after my order issues.

04:27:32   3          I simply want to remind you of that so that you

04:27:34   4   can be sure to discharge your meet and confer obligations

04:27:38   5   under the Court's order.

04:27:39   6          All right.  Having covered what's set for today

04:27:43   7   and the matters in dispute being under submission with the

04:27:46   8   Court, that will complete the claim construction portion of

04:27:49   9   today's hearing.  Thank you for your attendance, counsel.

04:27:53   10  You are excused.

04:27:54   11         And the Court stands in recess.

           12         (Hearing concluded.)

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

1                          <u>CERTIFICATION</u>

2

3            I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9     <u>/S/ Shelly Holmes         </u>            <u>1/13/21   </u>
      SHELLY HOLMES, CSR, TCRR                Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 10/31/21

12

13

14

15

16

17

18

19

20

21

22

23

24

25